887 F.2d 1141
 58 USLW 2299, 29 Fed. R. Evid. Serv. 551
 UNITED STATES of America, Appellee,
v.
Filippo CASAMENTO, Emanuele Palazzolo, Giovanni Cangialosi,
Salvatore Salamone, Giovanni Ligammari, Frank Castronovo,
Gaetano Badalamenti, Salvatore Catalano, Giuseppe Lamberti,
Salvatore Mazzurco, Salvatore Lamberti, Giuseppe Trupiano,
Giuseppe Vitale, Lorenzo Devardo, Salvatore Greco, Francesco
Polizzi, Defendants-Appellants.
 Nos. 201-217, Dockets 87-1294 to 87-1299, 87-1303 and
87-1357 to 87-1366.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 26, 1989.
Decided Oct. 11, 1989.
 
 Joseph W. Ryan, Jr., Uniondale, N.Y., for defendant-appellant Filippo Casamento.
 Bobbi C. Sternheim, New York City, for defendant-appellant Emanuele Palazzolo.
 Gerald J. Dichiara, New York City, for defendant-appellant Giovanni Cangialosi.
 Susan G. Kellman, New York City, for defendant-appellant Salvatore Salamone.
 Barry M. Fallick, New York City, (Rochman, Platzer & Fallick, New York City, of counsel), for defendants-appellants Giovanni Ligammari and Giuseppe Lamberti.
 Kenneth J. Kaplan, New York City (Robert F. Katzberg, Alice K. Berke, Kaplan & Katzberg, New York City, of counsel), for defendant-appellant Frank Castronovo.
 Charles F. Carnesi, Brooklyn, N.Y., for defendant-appellant Gaetano Badalamenti.
 James A. Cohen, New York City (Mario Malerba, Queens, N.Y., of counsel), for defendant-appellant Salvatore Catalano.
 Jonathan J. Silbermann, New York City, for defendants-appellants Salvatore Mazzurco and Salvatore Lamberti. Marvin E. Schechter, Brooklyn, N.Y. (Sercarz, Schechter & Lopez, Brooklyn, N.Y., of counsel), for defendant-appellant Salvatore Lamberti.
 Salvatore S. Russo, Brooklyn, N.Y., for defendant-appellant Giuseppe Trupiano.
 Harriet B. Rosen, Brooklyn, N.Y., for defendant-appellant Giuseppe Vitale. James T. Moriarty, New York City, for defendant-appellant Lorenzo Devardo.
 Alan Scribner, Contoocook, N.H. (Larry Bronson, Bayonne, N.J., of counsel), for defendant-appellant Salvatore Greco.
 Morrill J. Cole, Hackensack, N.J. (Evan L. Steinberg, Cole, Schotz, Bernstein, Meisel & Forman, Hackensack, N.J., of counsel), for defendant-appellant Francesco Polizzi.
 Louis J. Freeh, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Robert B. Bucknam, Andrew C. McCarthy, Daniel C. Richman, Celia Goldwag Barenholtz, Asst. U.S. Attys., New York City, Richard A. Martin, Robert C. Stewart, Dept. of Justice Attys., of counsel), for appellee.
 Robert M. Kaufman, Charles S. Sims, Andrew W. Reich (Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel), for The New York Community Trust, amicus curiae.
 Before NEWMAN, PIERCE and MAHONEY, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 These appeals stem from the convictions of various persons alleged to have been members of an international narcotics ring. This prosecution came to be known popularly as "The Pizza Connection Case." Appellants present numerous issues for review.
 
 
 2
 For the reasons set forth below, we reverse the judgments of conviction and sentence of appellant Frank Castronovo on count ten and appellant Giuseppe Trupiano on counts one and sixteen, and we vacate the restitution penalties ordered as to eight of the appellants; otherwise, we affirm the judgments of conviction and sentence.
 
 BACKGROUND
 
 3
 Appellants Filippo Casamento, Emanuele Palazzolo, Giovanni Cangialosi, Salvatore Salamone, Giovanni Ligammari, Frank Castronovo, Gaetano Badalamenti, Salvatore Catalano, Giuseppe Lamberti, Salvatore Mazzurco, Salvatore Lamberti, Giuseppe Trupiano, Giuseppe Vitale, Salvatore Greco and Francesco Polizzi appeal their judgments of conviction and sentence after a jury trial entered in the United States District Court for the Southern District of New York (Leval, Judge ) on Indictment SS 84 Cr. 236, which charged thirty-five defendants with engaging in a drug trafficking and money laundering conspiracy. Badalamenti also appeals his judgment of conviction (Metzner, Judge ) on Indictment 86 Cr. 1128, which charged him with one count of criminal contempt, to which Badalamenti conditionally pled guilty. Appellant Lorenzo Devardo, named as a defendant in Indictment SS 84 Cr. 236, pled guilty to lesser charges in a superseding information. He challenges the sentence he received on his judgment of conviction on Information SSSSS 84 Cr. 236, which charged him with two counts of firearms violations under 26 U.S.C. Secs. 5842, 5845, 5861(d), 5861(h) and 5871.
 
 
 4
 Indictment SS 84 Cr. 236 was filed on February 19, 1985. Following pleas of not guilty, trial began on September 30, 1985 and continued for more than seventeen months, until March 2, 1987, when the jury returned guilty verdicts against eighteen of the named defendants. Fifteen of these defendants now appeal their judgments of conviction and sentence.
 
 
 5
 Indictment SS 84 Cr. 236 contained sixteen counts. Count one charged all thirty-five defendants with conspiring to import and distribute narcotics in violation of 21 U.S.C. Sec. 846. All of the appellants except Salvatore Salamone, who was acquitted on this count, and Lorenzo Devardo, who pled guilty to lesser charges, were found guilty on this count. Counts two through eleven each charged a single defendant with engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848. Gaetano Badalamenti was found guilty of count two, Salvatore Catalano was found guilty of count three, Giuseppe Lamberti was found guilty of count five and Frank Castronovo was found guilty of count ten. The jury acquitted Salvatore Mazzurco of count six and Salvatore Lamberti of count seven. The defendants charged in counts four (Giuseppe Ganci), eight (Pietro Alfano), nine (Giuseppe Soresi) and eleven (Gaetano Mazzara) are not appellants here. Appellants Frank Castronovo, Salvatore Catalano, Salvatore Greco and Salvatore Salamone were found guilty of count twelve, which charged fifteen defendants with conspiring to transport money out of the United States without filing required currency reports in violation of 18 U.S.C. Sec. 371. Appellant Salvatore Salamone was found guilty of count thirteen, which charged six defendants with violating 18 U.S.C. Secs. 1001 and 2 by causing false statements concerning various cash deposits to be made to the Internal Revenue Service or aiding and abetting the making of such statements. Count fourteen charged fifteen defendants with violating 31 U.S.C. Secs. 1059 (recodified at 31 U.S.C. Sec. 5322), 1081 (recodified at 31 U.S.C. Sec. 5313), 5313(a) and 5322(b) and 18 U.S.C. Sec. 2 by failing to file required currency reports or aiding and abetting such failure. Appellants Frank Castronovo, Salvatore Catalano, Salvatore Greco and Salvatore Salamone were found guilty on this count. Count fifteen charged ten defendants with failing to file required currency reports in violation of 31 U.S.C. Secs. 1059 (recodified at 31 U.S.C. Sec. 5322) and 1101 (recodified at 31 U.S.C. Sec. 5316) and 18 U.S.C. Sec. 2. Appellants Frank Castronovo and Salvatore Catalano were found guilty on this count. Finally, count sixteen charged thirty-one defendants, including all of the appellants except Gaetano Badalamenti, with violating 18 U.S.C. Secs. 1962(d) and 2 by conspiring to conduct and participating, through a pattern of racketeering, in an enterprise which engaged in international drug trafficking and money laundering related thereto, or aiding and abetting therein. Found guilty on this count were appellants Giovanni Cangialosi, Filippo Casamento, Frank Castronovo, Salvatore Catalano, Salvatore Greco, Giuseppe Lamberti, Salvatore Lamberti, Giovanni Ligammari, Salvatore Mazzurco, Emanuele Palazzolo, Francesco Polizzi, Giuseppe Trupiano and Giuseppe Vitale. Salvatore Salamone was acquitted of count sixteen and Lorenzo Devardo pled guilty to lesser charges. The charges for which each appellant was indicted, the disposition of those charges, and the sentences imposed are set forth in an appendix to this opinion.
 
 
 6
 Indictment SS 84 Cr. 236 charged and the government sought to prove at trial the existence of a large-scale conspiracy to import and distribute narcotics and to launder the proceeds of the drug sales--count one charged a narcotics conspiracy and count sixteen a RICO conspiracy. We will not recount all the evidence adduced at trial. However, it is necessary to provide a brief overview of the alleged conspiracy.
 
 
 7
 The government contends that the alleged criminal events herein began in Sicily in the 1970's when members of the Sicilian Mafia decided to begin shipping narcotics to the United States. These shipments came from two places, Sicily and South America. In Sicily, Mafia members imported morphine base from Turkey, refined it, and smuggled the heroin they produced into the New York metropolitan area. Among the Sicilian Mafia members who the government contends were responsible for shipping the heroin and developing a distribution network in the United States were defendant Giuseppe Soresi and appellants Lorenzo Devardo and Giovanni Cangialosi. According to the government, the source of narcotics from South America was appellant Gaetano Badalamenti, a fugitive living in Brazil who was allegedly the deposed head of the Sicilian Mafia and who, in connection with this prosecution, later was extradited from Spain.
 
 
 8
 It is contended that Badalamenti sent narcotics to the Midwest, where the drugs allegedly were distributed by defendants Pietro Alfano and Salvatore Evola and appellants Emanuele Palazzolo, Giuseppe Vitale and Giuseppe Trupiano. The midwestern distributors delivered narcotics to a distribution group in the New York area. This New York group, comprised of members of the American Mafia, or La Cosa Nostra, also received heroin shipments from Sicily.
 
 
 9
 Further, according to the government, appellant Salvatore Catalano led the New York group, closely assisted by defendant Giuseppe Ganci and appellants Giuseppe Lamberti, Salvatore Lamberti, Salvatore Greco and Salvatore Mazzurco. Allegedly, Catalano also worked closely with defendant Gaetano Mazzara and appellant Frank Castronovo, who the government claims were two Sicilian Mafia members stationed in New Jersey.
 
 
 10
 The government asserts that the New York group sold narcotics to secondary wholesalers, such as appellant Filippo Casamento and defendant Benito Zito, and that to finance its importation of narcotics the New York group relied on payments from investors, such as appellants Francesco Polizzi and Giovanni Ligammari.
 
 
 11
 In addition, according to the government, as part of the conspiracy's money laundering operation, appellants Catalano, Castronovo, Ganci, Salvatore Salamone and his brother, defendant Filippo Salamone, accumulated the conspiracy's cash proceeds in pizza parlors, and then either smuggled the cash out of the country in suitcases or laundered it through a maze of bank accounts. The government asserts that the money was deposited in Swiss bank accounts, and from there went to conspirators in Italy or to a man known as Musullulu, who the government claims supplied the conspirators with morphine base from Turkey.
 
 
 12
 Having briefly described the alleged criminal activities, we now turn to a discussion of the various issues raised on appeal.
 
 DISCUSSION
 I. Severance and Related Issues
 
 13
 A principal issue raised on appeal is whether the joint trial of the numerous defendants deprived the individual defendants of their right to due process. To support their claims of lack of due process, appellants mainly point to (1) the length and complexity of the trial, (2) the spillover prejudice which allegedly resulted from the joinder of the defendants, and (3) the publicity and the alleged atmosphere of violence which surrounded the trial.
 
 A. Length and Complexity of Trial
 
 14
 By any standard, the magnitude of this trial was extraordinary. Based on a multi-count indictment which charged thirty-five defendants, the joint trial of twenty-one defendants spanned more than seventeen months, produced more than forty-thousand pages of trial transcript, and, according to defense counsel, involved the introduction of thousands of exhibits and the testimony of more than 275 witnesses.
 
 
 15
 During the course of the trial, Judge Leval allowed the government to display charts to the jury which, through graphs, maps or brief written descriptions, summarized the evidence the government had presented. Much of this evidence was uncontested, consisting of the testimony of government agents regarding observations made during surveillance, transcripts of intercepted telephone conversations, and seized items such as guns or money. Before a chart was shown to the jury, the judge gave the defendants a chance to object to its contents. In some instances, he directed that changes be made in the contents of a chart in response to a defendant's objection. Several times during the trial, the district judge instructed the jury that the charts were not evidence. He also told the jurors that they were free to disregard the contents of the charts if they chose to do so. The judge repeated these instructions during his charge.
 
 
 16
 Near the end of the trial, the government compiled a binder which contained reproductions of the summary charts which had been displayed to the jury during the trial. During its deliberations, the jury requested and received copies of this binder, as well as the entire trial transcript, specifically identified items of evidence, and also a blackboard, chalk and an eraser.
 
 
 17
 Appellants argue that the length and complexity of the trial prevented the jury from adequately remembering and evaluating the evidence. They argue that because the jury could not remember the evidence sufficiently, it had to rely uncritically on the government's summary charts. Appellants contend that, because the jury was unable to evaluate the evidence independently, severance was required, and that the district court's refusal to sever the trial, as requested, deprived them of due process.
 
 
 18
 In assessing appellants' argument, we begin by noting the standard of review we must apply to a district court's decision to deny a motion for severance. Motions to sever are committed to the sound discretion of the trial judge. United States v. Chang An-Lo, 851 F.2d 547, 556 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). We will reverse a ruling denying a motion to sever upon a showing that the trial judge clearly abused his discretion. Id. In order to meet this "extremely difficult burden" of showing an abuse of discretion, an appellant must demonstrate that the denial of the motion caused substantial prejudice. United States v. Carpentier, 689 F.2d 21, 27 (2d Cir.1982) (citing United States v. Werner, 620 F.2d 922, 928 (2d Cir.1980)), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983). If the denial of the motion causes some prejudice, but less than substantial prejudice, we are not apt to reverse, since, by and large, joinder promotes judicial efficiency. Id.
 
 
 19
 We do not agree that the length and complexity of this trial caused the appellants substantial prejudice. First of all, we have no reason to believe that the jury lacked the intellectual capacity to meet the task before it. Although the jury had to evaluate a tremendous amount of evidence, the nature of the evidence and the legal concepts involved in the case were not extraordinarily difficult to comprehend, as they might be, for example, in a complex anti-trust case involving abstruse economic theories or an employment discrimination case involving technical statistical evidence and formulae. Here, the jury was required to grasp the legal significance of shipments of narcotics, sales of narcotics, and transfers of money. See United States v. Moten, 564 F.2d 620, 627 (2d Cir.) (lengthy, multi-defendant narcotics conspiracy trial not "beyond the ken of the ordinary juror," since "purchase and sale of hard drugs is basically a simple operation"), cert. denied, 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977).
 
 
 20
 The clearest indication that the jury was able to evaluate the evidence, despite its being voluminous, is provided by the jury's verdicts themselves. We have held that in a multi-defendant case, a mix of guilty and not guilty verdicts is some indication that the jury was able to sift through voluminous evidence and differentiate among various defendants. Here, the jury's not guilty verdicts on certain counts (see supra Background; infra Appendix) inform us that the jury differentiated among the defendants. Moten, 564 F.2d at 627; see also United States v. Carson, 702 F.2d 351, 367 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). The clear distinctions the jury drew among the defendants strongly suggest that it was indeed able to evaluate the evidence critically and follow the instructions of the trial judge.
 
 
 21
 Another indication that the jury was able to evaluate the evidence fairly was the apparent effort it made during its deliberations to parse and weigh the evidence. The jury's requests for the entire trial transcript, for various items in evidence, and for a blackboard, chalk, and eraser, as well as copies of the summary chart book, suggest that the jurors, rather than despairing in the face of the daunting amount of evidence, accepted their arduous role and diligently and conscientiously proceeded over the six-day period of deliberations to meet their responsibilities as fact-finders. See United States v. Aiello, 771 F.2d 621, 631 (2d Cir.1985) (jury's request during deliberations for multiple readbacks of testimony, and its determination of not guilty on certain charges, indicative of "jury's careful discrimination in weighing the evidence"). We believe that a jury overwhelmed by the evidence would not have manifested the interest shown here in making such an effort.
 
 
 22
 One incident in particular buoys our belief that the jury fairly and carefully evaluated the evidence. During its deliberations, the jury, in a note to the judge, requested "testimony and surveillance reports, if any, of July 24, 1983 surveillance." According to one of the racketeering acts with which Castronovo was charged, number 56 on the jury's verdict sheet, he travelled from New Jersey to New York on July 24, 1983. After receiving the jury's note, the prosecutor and defense counsel agreed that no surveillance evidence relating to Castronovo's activities on July 24, 1983 existed. The judge then instructed the jury to strike number 56 from the verdict sheet. The jury's ability to discover that no evidence supported this particular racketeering act, when 128 such acts were charged in the indictment, is telling support for the conclusion that the jury scrutinized the evidence with great care.
 
 
 23
 We do not believe that the jury's use of the government's summary charts rendered the trial unfair. This court has long approved the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, United States v. Pinto, 850 F.2d 927, 935 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988), so long as the judge properly instructs the jury that it is not to consider the charts as evidence. United States v. Baccollo, 725 F.2d 170, 173 (2d Cir.1983); United States v. Goldberg, 401 F.2d 644, 647-48 (2d Cir.1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969). Here, the judge gave the jury the required instruction. We conclude that the court's rulings permitting the jury's use of the government's summary charts was not improper.
 
 
 24
 Appellants argue that despite the judge's instructions, the vast amount of evidence presented to the jury made it inevitable that the jury would rely uncritically on the government's summary charts. We do not accept this argument. Barring contrary evidence, we must presume that juries follow the instructions given them by the trial judge. Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987); United States v. Pforzheimer, 826 F.2d 200, 205 (2d Cir.1987). This presumption is "rooted less in the absolute certitude that [it] is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." Richardson, 481 U.S. at 211, 107 S.Ct. at 1709. Here, no evidence shows otherwise, and we thus presume that the jury followed the judge's instruction not to consider the summary charts as evidence or as fact, but rather to evaluate the evidence independently.
 
 
 25
 In addition to their argument that the jury could not fairly evaluate the great volume of evidence, appellants argue that the length and complexity of the trial placed a great burden on the jurors, and they suggest that this burden may have caused the jurors to harbor resentment toward the defendants. Although the trial was undoubtedly burdensome for the jury, and one juror, later excused, did express resentment towards the defendants, we do not believe that the burden caused appellants to suffer substantial prejudice. We base this conclusion in large part (1) on the verdicts the jury rendered, and (2) on the apparently careful way in which the jury evaluated the evidence (see discussion above), both of which support Judge Leval's characterization of the jury's performance during the trial as "fair, open-minded, [and] conscientious."
 
 
 26
 Although we hold here that the length and complexity of this trial did not deprive appellants of their right to due process, we do have misgivings about trials of this magnitude. We are aware that lengthy multi-defendant trials may provide certain benefits in terms of the judicial system, see Richardson, 481 U.S. at 209-10, 107 S.Ct. at 1708 (such trials can promote efficiency and minimize the chance of inconsistent verdicts); United States v. Cohen, 145 F.2d 82, 91 (2d Cir.1944) (such trials can allow witnesses to avoid the burden of successive trials), cert. denied, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945), however, they also can have disadvantages, see United States v. Gallo, 668 F.Supp. 736, 754-56 (E.D.N.Y.1987) (such trials can place great burdens on jurors, defendants, counsel, and trial judges); see generally Federal Bar Council Committee on Second Circuit Courts, A Proposal Concerning Problems Created By Extremely Long Criminal Trials (1989). We recognize the evident disadvantages which can occur in these mega-trials; we also recognize that district judges must retain a considerable degree of discretion in determining whether, on balance, the fair administration of justice will be better served by one aggregate trial of all indicted defendants or by two or more trials of groups of defendants. However, we believe that some benchmarks ought to be set out to guide the exercise of that discretion. First, the district judge should elicit from the prosecutor a good-faith estimate of the time reasonably anticipated to present the government's case. Though the prosecutor's estimate should not become the subject of a contested hearing, the judge need not accept the estimate without question but should be free to make an independent assessment based on various factors including the number of defendants, the time and territorial scope of the crimes charged, the number of witnesses likely to be called, and the number and size of exhibits likely to be introduced, including wiretaps.
 
 
 27
 In those cases where the judge determines that the time for presentation of the prosecution's case will exceed four months, the judge should oblige the prosecutor to present a reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials for groups of defendants. In determining whether the prosecutor has made an adequate showing, the judge should weigh the interests of the prosecution, the defendants, the jurors, the court, and the public. Again, we do not contemplate a contested hearing nor precise findings on this subject. A submission by the prosecutor, a response by the defendants seeking a severance, and a conclusion by the judge will suffice. The judge should give particular attention to the feasibility of conducting separate trials for any one or more defendants as to whom a separate trial would be relatively brief, especially if such defendants are willing to stipulate, for purposes of a separate trial, to facts concerning the activities of other defendants who remain to be tried in the main trial. Such separate trials, if ordered, may, in the judge's discretion, be assigned for simultaneous trial before other judges.
 
 
 28
 In considering the advisability of separate brief trials for one or more defendants, the judge should explore with the prosecutor whether the interests of justice would be adequately served by limiting the prosecution of such defendants to charges that can be proven expeditiously and that, in the event of conviction, carry exposure to adequate maximum penalties. It makes little sense to extend the time of a multi-month trial by including a peripheral defendant against whom a few days of evidence in a separate trial would be sufficient to obtain conviction on scaled down charges exposing him to approximately as much punishment as he would likely have received on the original charges.
 
 
 29
 Finally, in assessing the appropriate number of defendants for any trial in which the prosecution's case is likely to require more than four months to present, the judge should oblige the prosecutor to make an especially compelling justification for a joint trial of more than ten defendants. Even in the event that the aggregate time for separate trials would not be less than the time for a joint trial of all defendants, there are significant advantages to be achieved. The lives of each group of jurors would be imposed upon for a shorter time, there would be a smaller group of defense counsel in each trial with a consequent reduction in trial disputes, the trial judge would have a more manageable task, and the jurors' ability to focus on individual defendants would be enhanced. While the prosecution's estimate that separate trials will each require all of the evidence presented at a joint trial is often not borne out when severances occur, we note that in this case there is a striking example of an instance when a contrary estimate was made. One of the original co-defendants herein was Giuseppi Baldinucci. Instead of enduring a seventeen-month trial, he was severed at the instance of the government and brought to trial on narrower charges. He was convicted after a trial lasting just seven days.
 
 
 30
 We recognize the extreme diligence with which Judge Leval exercised his discretion in deciding whether to proceed with a joint trial of the twenty-one defendants in this case. We are entirely satisfied that his trial management decisions fully respected the rights of the defendants. Indeed, the judge is to be commended for the fairness, patience, and sound judgment he displayed throughout the conduct of this most extraordinary proceeding. Nevertheless, we offer the guidance outlined in the preceding paragraphs in the hope that we will not soon again be presented with the transcript of a seventeen-month trial in which more than thirty persons were named as defendants.
 
 B. Alleged Spillover Prejudice
 
 31
 Several appellants, especially those whose alleged roles in the conspiracy were comparatively minor, argue that evidence of the conduct of other defendants and a lack of coordination in defense strategies caused them substantial spillover prejudice which could have been avoided had their motions for severance been granted. We do not believe that any prejudicial spillover suffered by any appellant was sufficiently substantial to warrant reversal based on the denial of the severance motions. First, even if each defendant had been tried separately, much of the evidence the government presented at the joint trial regarding the activities of alleged co-conspirators would have been admissible in the single-defendant trials. See United States v. Bari, 750 F.2d 1169, 1178 (2d Cir.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); United States v. Cunningham, 723 F.2d 217, 230 (2d Cir.1983), cert. denied, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); see also Fed.R.Evid. 801(d)(2)(E). Further, the district judge instructed the jury to consider the evidence against each defendant separately from the evidence presented against the other defendants. See Carson, 702 F.2d at 367 (judge's instructions to jury to afford each defendant separate consideration, inter alia, leads to finding of no unfair spillover prejudice). More importantly, as has been discussed, the jury carefully evaluated the evidence and rendered discriminating verdicts. See United States v. Garcia, 848 F.2d 1324, 1334 (2d Cir.1988) (partial acquittal of a defendant in multi-defendant trial "is a strong indication ... that there was no prejudicial 'spillover' of evidence"), rev'd on othe grounds, --- U.S. ----, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989); Carson, 702 F.2d at 367 (verdicts of acquittal on certain counts show no significant spillover effect occurred). Because of the district court's thorough instructions to the jury, and because we believe the jury's verdicts were reached after careful consideration of the evidence, we conclude that any prejudice appellants suffered in this regard was less than substantial.
 
 
 32
 Our conclusion is not altered by consideration of the additional prejudicial spillover allegedly suffered by appellants as a result of a lack of coordination in the testimony and trial strategies of the individual defendants. Appellants point to the fact that Badalamenti testified that certain telephone conversations he had with Mazzurco did not concern narcotics, while Mazzurco testified that the conversations concerned the sale of precious stones. Appellants also point to certain disagreements which arose among the defendants over the cross-examination of certain witnesses and over the jury instructions which should be requested. Moreover, Cangialosi argues that he was prejudiced when Badalamenti's counsel, in his summation, accused Cangialosi of having carried a message, written in code, which allegedly directed the Mafia to kill Badalamenti.
 
 
 33
 Considering these contentions seriatim, we first note that, while differences among the defenses asserted by co-defendants might constitute justification for severance when the jury, in order to believe one defendant, " 'must necessarily disbelieve the testimony offered on behalf of his co-defendant,' " Carpentier, 689 F.2d at 28 (quoting United States v. Berkowitz, 662 F.2d 1127, 1134 (5th Cir. Unit B Dec. 1981)), here, Badalamenti's and Mazzurco's defenses were not in conflict. The jury could have believed both that the Badalamenti-Mazzurco telephone conversations did not concern narcotics trafficking and that they did concern the sale of precious stones.
 
 
 34
 Additionally, we do not believe that differences in defendants' trial tactics and strategies required severance. Differences such as those noted by appellants will almost inevitably arise in multi-defendant trials, and to hold that they require severance would effectively ban this type of trial; we decline to impose such a ban.
 
 
 35
 Finally, we do not believe that Badalamenti's accusation against Cangialosi required severance. Severance is not necessarily warranted "even if the defendants are hostile or attempt to cast the blame on each other." United States v. Becker, 585 F.2d 703, 707 (4th Cir.1978), cert. denied, 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979). Mere "fingerpointing" does not require severance. United States v. Arruda, 715 F.2d 671, 679 (1st Cir.1983). Here, Badalamenti's counsel suggested that Cangialosi may not even have known the content of the message he was accused of having carried. Under these circumstances, we cannot conclude that Cangialosi suffered prejudice sufficient to compel severance. In sum, we do not believe that the defendants' lack of coordination in their defense strategies--even considered in conjunction with the spillover prejudice allegedly suffered as a consequence of the introduction of evidence concerning the conduct of other defendants--resulted in a denial of appellants' due process rights.
 
 
 36
 C. Publicity and Alleged Atmosphere of Violence
 
 
 37
 Further, appellants argue that the publicity and the alleged atmosphere of violence which surrounded the joint trial rendered it unfair. To support this argument appellants point to the following: (1) the government's allegation, in its opening statement to the jury, that Catalano was involved in the 1979 murder of the alleged Mafia figure Carmine Galante; (2) the great deal of publicity which surrounded the trial in general; (3) the publicity surrounding the murder, approximately two and one-half months into the trial, of the alleged Mafia figure Paul Castellano; (4) the violent death, about fourteen months into the trial, of defendant Gaetano Mazzara and the publicity which surrounded this event; (5) the non-fatal shooting of defendant Pietro Alfano, which occurred during the summation stage of the trial, and the publicity which surrounded this event; and (6) the government's display to the jury of various guns seized from Greco's pizzeria. As we discuss below, after reviewing the record, we conclude that the publicity and the alleged atmosphere of violence which surrounded this case did not deprive appellants of due process.
 
 1. The Galante Murder
 
 38
 The district court stated that it was prejudicial for the government to mention in its opening argument Catalano's alleged connection to the Galante murder. Rather than grant a mistrial however, Judge Leval instructed the jury that the Galante murder was not a part of the trial and that the jury should not consider it. Although the defendants, as the district court acknowledged, were prejudiced by the government's mention of the Galante murder, we do not believe that this prejudice was substantial enough to have deprived appellants of their right to due process. First, given the care with which the jury apparently considered the evidence (see discussion above), we think the government's prejudicial statement did not have a significant impact. Cf. Aiello, 771 F.2d at 630-31 (jury's careful discrimination in weighing evidence indicates jury was not influenced by third party contact with one of the jurors). Second, the district judge gave the jury a proper instruction. Third, without more, we presume, as we must, Richardson, 481 U.S. at 211, 107 S.Ct. at 1709; Pforzheimer, 826 F.2d at 205, that the jury followed the judge's instruction not to consider the government's mention of the Galante murder. In short, in light of the jury's apparent care in weighing the evidence, coupled with the judge's instruction to the jury, we hold that the government's statement in its opening argument did not deprive defendants of a fair trial.
 
 2. Publicity in General
 
 39
 Without a doubt, this trial attracted a great deal of media attention. We do not believe, however, that this publicity rendered the trial unfair. On several occasions, Judge Leval instructed the jury not to pay attention to anything which appeared in the media concerning the trial. In the absence of evidence to the contrary, we will presume the jury followed these admonitions and avoided exposure to news reports about the trial. See United States v. Greschner, 802 F.2d 373, 381 (10th Cir.1986), cert. denied, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987); United States v. Metzger, 778 F.2d 1195, 1209 (6th Cir.1985), cert. denied, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986). Some warrant for this presumption is provided by the fact that several times during the trial the judge conducted voir dire of the jury to satisfy himself that the jurors had followed his instructions and had indeed avoided news reports about the case, e.g., on January 13, 1986, following the reported appearance in The New York Times of an "article" by former President Ronald Reagan which concerned organized crime and which favorably mentioned then United States Attorney Rudolph Giuliani; on January 16, 1986, following the reported appearance of a cover story in New York magazine about Nicholas Pileggi's book Wise Guy: Life in the Mob; on February 5, 1986, following the reported appearance in the New York Post of an article recounting testimony from the trial; and on December 3, 1986, following the Mazzara murder (see discussion below). A district judge has substantial discretion in determining whether potentially prejudicial publicity has affected a jury's impartiality, and a conclusion that the jury remained impartial will not be overturned on appeal absent an abuse of discretion. United States v. Scopo, 861 F.2d 339, 349 (2d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1750, 104 L.Ed.2d 186 (1989). Here, in light of the district judge's instructions and inquiries of the jury via voir dire, and his considered conclusions as to the jurors' impartiality, we believe that he acted well within his discretion in deciding that the publicity which the trial generated did not affect the jurors' ability to serve fairly.
 
 
 40
 3. The Castellano, Mazzara, and Alfano Incidents and the
 
 Publicity Surrounding Them
 
 41
 On December 16, 1985, Paul Castellano, a person who had been listed as an unindicted co-conspirator herein and whose name appeared on one of the charts shown to the jury, was murdered outside a restaurant in midtown Manhattan. The murder attracted a great deal of attention in the media. The day after the killing, the trial judge instructed the jury to ignore all news reports about the event. His inquiry of the jurors as to whether any of them would be unable to comply with his instruction evoked no negative response.
 
 
 42
 One year later, defendant Mazzara was murdered and his body was discovered in Brooklyn. After the murder, the judge told the jury that Mazzara had died, that the cause of his death was unrelated to the trial, and that the members of the jury should stay home and avoid all news reports entirely for two days. Judge Leval interviewed each juror to ensure that each could comply with his instructions. Later, after conducting voir dire of the jury, he was assured that the jury had complied with his instructions.
 
 
 43
 In February 1987, during the summation stage of the trial, defendant Alfano was shot while walking in the streets of New York City. Upon learning of the shooting, the district judge instructed the jury to avoid all news reports. He then conducted a voir dire of the jury to ensure that the impartiality of the jury was not affected by the shooting; he was so assured. Finally, he ordered the jury sequestered for the remaining days of the trial.
 
 
 44
 We are satisfied that the judge's actions following the Castellano, Mazzara, and Alfano events sufficiently protected appellants from undue prejudice from the publicity these incidents generated, and that the judge did not abuse his discretion in deciding to proceed with the trial. See Scopo, 861 F.2d at 349; Greschner, 802 F.2d at 381; Metzger, 778 F.2d at 1209.
 
 
 45
 Apart from the publicity surrounding these incidents, whether the sudden absences of Mazzara and Alfano from the courtroom may possibly have made the jury more inclined to believe that those two defendants, and by association, the rest of the defendants, led lives of violence is a matter of conjecture, and, as such, is not a sufficient basis from which we can conclude that the trial was unfair, especially given the appropriate actions timely undertaken by the trial judge.
 
 4. Display of the Guns
 
 46
 Finally, we do not believe the government's display to the jury of guns, including an Uzi rifle, a semi-automatic pistol and a Luger pistol, seized from Greco's pizzeria, rendered the trial unfair. Although the government did not allege that the defendants used these guns, the guns themselves, in context, were probative of the existence of the narcotics conspiracy charged. See United States v. Fernandez, 829 F.2d 363, 367 (2d Cir.1987); United States v. Wiener, 534 F.2d 15, 18 (2d Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). While Judge Leval, in his discretion, could have restricted the government only to showing photographs of these guns to the jury, we do not believe that the judge unfairly prejudiced appellants by allowing the government to display the guns themselves.
 
 
 47
 In sum, we conclude that appellants did not suffer a deprivation of their rights to due process as a result of the length and complexity of the trial, or due to any spillover prejudice which they may have suffered, or due to the publicity and the alleged atmosphere of violence which surrounded the trial.
 
 II. Sufficiency of the Evidence
 
 48
 Eleven of the appellants--Badalamenti, Cangialosi, Casamento, Castronovo, Greco, Ligammari, Palazzolo, Polizzi, Salamone, Trupiano and Vitale--claim that the evidence presented against them was legally insufficient to support their convictions on certain counts. We conclude that the claims of Castronovo and Trupiano have merit. We find the claims of the other appellants lack merit. Below we set forth the reasons for our conclusions.
 
 A. General Principles
 
 49
 The standards by which we review claims challenging the sufficiency of the evidence are well established. An appellant challenging the sufficiency of the evidence bears a very heavy burden. United States v. Nusraty, 867 F.2d 759, 762 (2d Cir.1989). A conviction must be allowed to stand if, "after viewing the evidence in the light most favorable to the prosecution," the reviewing court finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A jury's verdict will be sustained if there is substantial evidence to support it. United States v. Nersesian, 824 F.2d 1294, 1324 (2d Cir.), cert. denied, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987).
 
 
 50
 Further, a reviewing court must view pieces of evidence not in isolation but in conjunction. United States v. Young, 745 F.2d 733, 762 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Viewing the evidence in conjunction is especially important in a conspiracy case such as this, where so much of the evidence is not incriminating on its face and the jury, to infer the existence of a conspiracy, must piece together circumstantial evidence. See Young, 745 F.2d at 762.
 
 
 51
 Circumstantial evidence, it should be noted, if relied upon by the jury, is of no lesser probative value than direct evidence. United States v. Glasser, 443 F.2d 994, 1007 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971). It is the role of a jury to draw reasonable inferences or conclusions from facts which the jury determines the evidence establishes. Whether the jury, in determining guilt, relies upon direct evidence, or upon reasonable inferences drawn from circumstantial evidence, the inquiry remains the same: there must be in either case sufficient evidence from which any rational juror could find a defendant guilty beyond a reasonable doubt. See Jackson, 443 U.S. at 319, 99 S.Ct. at 2789.
 
 
 52
 Finally, we note that once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming. United States v. Ciambrone, 787 F.2d 799, 806 (2d Cir.), cert. denied, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). However, the evidence must show that the defendant, even if unaware of the contours of the broader conspiracy, at least had knowledge that a common unlawful endeavor existed, Nusraty, 867 F.2d at 763, and that the defendant agreed to join that endeavor, United States v. Delvecchio, 816 F.2d 859, 864 (2d Cir.1987).
 
 B. Badalamenti
 
 53
 The jury found Badalamenti guilty on counts one and two. With regard to count one, the narcotics conspiracy count, Badalamenti claims (1) that the evidence is insufficient to show that he agreed to ship narcotics into the United States and (2) that even if he had so agreed, the evidence is insufficient to support a conclusion that his activities and those of the other defendants formed a single conspiracy. With regard to count two, the continuing criminal enterprise count, Badalamenti claims that the government failed to prove any of the elements of the crime. We conclude that Badalamenti's claims lack merit.
 
 1. Narcotics Conspiracy
 
 54
 The record contains sufficient evidence to support a rational conclusion that Badalamenti imported narcotics into the United States. Intercepted telephone calls show that Badalamenti spoke to Mazzurco, an alleged buyer, on more than one occasion about the shipment of various commodities which he referred to as "shirts," "parcels" and "containers." Both the evidence showing that Mazzurco was a narcotics dealer (see infra Point VIII) and Badalamenti's refusal during cross-examination to explain the nature of these calls strongly support the inference that the calls concerned the importation of narcotics.
 
 
 55
 Evidence of two deliveries demonstrate that these telephone calls were not just fruitless conversations, as Badalamenti argues, but were discussions which led to consummated deals. With regard to the first delivery, toll records suggest that on April 30, 1983, defendant Pietro Alfano, who Badalamenti concedes was his subordinate, called Vitale and Palazzolo, two of Alfano's assistants, (see infra Points II(H), II(L)). The same day, Mazzurco called defendant Giuseppe Ganci and told him that "tomorrow I'm supposed to meet those people ... [and] bring them 95 cents."[1] Ganci said: "I've got about 40." Mazzurco testified at trial that "them" was a reference to Alfano and others, and that "95 cents" was a reference to $95,000. The day after Mazzurco called Ganci, a government agent observed him leaving Ganci's house carrying a brown bag. Mazzurco testified that he gave Alfano $40,000.
 
 
 56
 Evidence suggests that a second delivery occurred on February 4, 1984. That morning, Alfano phoned Mazzurco from a public telephone in Queens, New York. During the call, which the government intercepted, Alfano arranged to meet Mazzurco in a restaurant two hours later. That afternoon, presumably after Alfano and Mazzurco met, Giuseppe Lamberti called Mazzurco and asked him, "[D]id he bring you everything?" Mazzurco answered in the affirmative. That evening, Alfano spoke to defendant Salvatore Evola, another one of Badalamenti's subordinates (see discussion below), and told him: "I left him everything."
 
 
 57
 Badalamenti's telephone calls, along with evidence of the two deliveries, in late April 1983 and early February 1984, are sufficient in the total context to justify a rational inference that he conspired to import narcotics. Badalamenti claims that even if he did conspire to import narcotics, he was not part of a single conspiracy which involved all the defendants named in the indictment. To support his claim that he was not part of the overall conspiracy charged in count one, Badalamenti argues that the government failed to produce evidence linking him to the Sicilian suppliers. Badalamenti's claim is unpersuasive. First, the evidence does suggest that Badalamenti was aware of the Sicilian suppliers. On March 30, 1984, a government agent observed Badalamenti's acknowledged subordinate, Alfano, meeting with Cangialosi, a representative of the Sicilian suppliers. (See infra Point II(C).) But even assuming arguendo that Badalamenti had no connection to the Sicilian suppliers, his claim would still fail. A lack of evidence connecting one defendant with others does not preclude a determination that all the defendants were co-conspirators; a single conspiracy may be found to link them all so long as each defendant knew from the scope of the operation that others were involved in the performance of functions vital to the success of the endeavor. United States v. Bynum, 485 F.2d 490, 496 (2d Cir.1973), vacated and remanded on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). In particular, suppliers unknown to each other may be co-conspirators when "the scale of the operation permit[s] the inference that the persons at a particular level must have known that others were performing similar roles." United States v. Miley, 513 F.2d 1191, 1207 (2d Cir.), cert. denied, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975). Here, a rational trier of fact could have found, based on the evidence of the deliveries in late April 1983 and early February 1984, discussed above, that Badalamenti imported tens of thousands of dollars worth of narcotics into the United States. Remarks he made in telephone calls--e.g., a remark regarding "the shirts of four years ago"--suggest that he may have been in the drug importing business for at least four or five years. Viewing the evidence and construing all permissible inferences in the light most favorable to the government, as we must, Nersesian, 824 F.2d at 1302-03, we conclude that there was sufficient evidence to support a rational trier of fact's conclusion that Badalamenti must have known from the scale of the operation in which he was involved that others were performing roles similar to his own as part of the same overall operation. Therefore, we hold that the evidence was sufficient for the jury to rationally conclude beyond a reasonable doubt that Badalamenti was part of a single conspiracy which involved other defendants.
 
 2. Continuing Criminal Enterprise
 
 58
 The record also contains sufficient evidence to support Badalamenti's conviction on the continuing criminal enterprise count. To prove Badalamenti guilty of having engaged in a continuing criminal enterprise, the government had the burden of establishing (1) that he committed a narcotics-related felony, (2) that the felony was part of a series of narcotics law violations, (3) that these violations were undertaken by Badalamenti in concert with at least five people he supervised or managed, and (4) that he obtained substantial income from the narcotics law violations. 21 U.S.C. Sec. 848; see United States v. Young, 745 F.2d 733, 746-48 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).
 
 
 59
 Badalamenti's participation in the narcotics conspiracy satisfies the first element of Sec. 848, which requires a narcotics-related felony violation. See Young, 745 F.2d at 751-52. The jury, in its special verdict, found that Badalamenti made twenty-two telephone calls in violation of 21 U.S.C. Sec. 843(b) over a nearly four-month-long period in furtherance of the conspiracy. These calls were made to Pietro Alfano, Mrs. Alfano, Giuseppe Lamberti, Salvatore Lamberti, Salvatore Mazzurco and Salvatore Evola. They serve to satisfy the second element, which requires a series of violations. See Young, 745 F.2d at 755.
 
 
 60
 Relying on Judge Newman's concurrence in Young, 745 F.2d at 767 n. 1, Badalamenti argues that these calls, which he claims all concerned a single shipment of narcotics, were insufficiently distinct to constitute a series of violations. This argument is meritless. In his concurrence, Judge Newman merely suggested that a phone call to arrange a drug sale and the consummation of the sale "moments later" did not constitute a series of violations. Id. Here, Badalamenti made twenty-two telephone calls and they spanned a nearly four-month-long period. We conclude that the calls were sufficiently distinct to constitute a series of violations.
 
 
 61
 It is also clear from the evidence that, as part of his criminal activity, Badalamenti supervised or managed at least five people, thus satisfying the third element of Sec. 848. Badalamenti concedes that he directed the activities of Alfano. Through Alfano, Badalamenti managed the narcotics-related activities of Palazzolo and Vitale. (See infra Points II(H), II(L).)The fourth person Badalamenti supervised was Evola. Evola admitted to an FBI agent that on one occasion he had sold a kilogram of cocaine. A search of Evola's residence revealed a piece of paper containing Badalamenti's telephone number written in code. His passport shows that he travelled to Brazil on the same date that Alfano did. The jury could have reasonably concluded that the purpose of this trip was to confer with Badalamenti. Figures found on a slip of paper Evola had in his possession matched figures found in a notebook which belonged to Alfano, strongly suggesting that Evola and Alfano worked as a team. In light of the evidence that Evola was in communication with Badalamenti, and appeared to work with Alfano, who was Badalamenti's subordinate, we hold that the record sufficiently supports a reasonable finding that Badalamenti managed the activities of Evola.
 
 
 62
 The fifth person Badalamenti supervised was defendant Vincenzo Randazzo. On one occasion, Randazzo called Mazzurco from Brazil and had a discussion with him about various items and their prices. During the conversation, Randazzo offered to send Mazzurco samples. Randazzo referred to a third person as the actual seller of the items, implying that he worked for this third party. Several days before this telephone call occurred, Mazzurco, standing on a street corner in Queens, New York, handed a brown paper bag containing $20,000 in cash to defendant Faro Lupo. Randazzo was with Lupo at the time. A toll record indicates that the morning after this transaction occurred, a brief telephone call was made from Alfano's home in Illinois to the New York City hotel in which Lupo was registered. Randazzo was with Lupo when Lupo registered at the hotel. On another occasion (see infra Point II(H)), Randazzo, along with Alfano, Lupo, and Palazzolo, met Mazzurco in a Queens restaurant. Randazzo's dealings with Mazzurco, the buyer of the narcotics Badalamenti imported; his connection to Alfano, Badalamenti's subordinate; his connection to Brazil, the nation from which Badalamenti operated; and his references to a third party for whom he appeared to work, considered together, provide sufficient evidence to support a rational finding that Badalamenti managed the activities of Randazzo.
 
 
 63
 The last element of Sec. 848 which the government had to prove was that Badalamenti derived substantial income from his narcotics activities. The statute does not prescribe the minimum amount of income that may be considered substantial, but we have held that as little as $2,000 may be sufficient. United States v. Losada, 674 F.2d 167, 173 (2d Cir.), cert. denied, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Here, evidence of the late April 1983 and early February 1984 deliveries, discussed above, allows the conclusion to be drawn that Baladamenti dealt in tens of thousands of dollars worth of narcotics. Badalamenti concedes that on one occasion, approximately two months after the February 4, 1984 delivery, Alfano brought him $10,000. Clearly, one may reasonably conclude from this evidence that Badalamenti derived substantial income from his narcotics activities.
 
 
 64
 In sum, we believe that the jury had before it sufficient evidence to rationally conclude that Badalamenti engaged in a continuing criminal enterprise, and that he was a member of the single narcotics conspiracy alleged in the indictment.
 
 C. Cangialosi
 
 65
 Cangialosi contends that the record contains insufficient evidence to support the conclusion that he knowingly participated in the charged conspiracy. We do not agree.
 
 
 66
 The record supports the government's theory that Cangialosi's role in the conspiracy was to help plan for the importation of narcotics by facilitating communication between his boss, the Sicilian narcotics supplier Giuseppe Soresi, and the New York buyers, Mazzurco and Giuseppe and Salvatore Lamberti. According to the testimony of agents who observed the meetings, on March 15, 1984, Cangialosi arrived in the United States, and was met at John F. Kennedy Airport in New York City by Mazzurco and Salvatore Lamberti. Over the next few days, Cangialosi met with Mazzurco, the Lambertis, and others. Two of these meetings occurred in parking lots at night.
 
 
 67
 The evidence discloses that, in addition to meeting with and presumably delivering messages to the New York buyers, Cangialosi attempted to arrange for the buyers to receive telephone calls from his boss in Sicily. On one occasion shortly after he arrived in the United States, Cangialosi was observed waiting by a public telephone on the side of a highway in Long Island, New York, with Mazzurco and Salvatore Lamberti. On another occasion, on the side of the same highway, Cangialosi spent approximately one-half hour near a public telephone with Giuseppe Lamberti. In intercepted telephone calls, Mazzurco discussed with the Lambertis the fact that "the engineer" had not called. On March 20, 1984, Soresi, apparently from Sicily, did place a call which came through a public telephone on the side of the highway in Long Island and he spoke to Mazzurco and Salvatore Lamberti. On the morning of the day Cangialosi went to Kennedy Airport to return to Sicily, a government agent saw Mazzurco in a car with Cangialosi. Mazzurco appeared to be writing down the numbers of public telephones on the side of the highway in Long Island. That afternoon, the agent who arrested Cangialosi at the airport seized from him a piece of paper with the numbers of various public telephones on it. Some of these telephones were located in the same area on the side of the highway where Mazzurco had appeared to copy numbers.
 
 
 68
 Two intercepted calls in particular support the conclusion that Cangialosi knowingly participated in the conspiracy. In the March 20 call, Salvatore Lamberti, speaking to Soresi on a public telephone in Long Island, said that "the one who came here will return.... He will come over there. And he will come to tell you the things with more preciseness." Cangialosi does not dispute that Soresi was in Sicily during this telephone call. The jury could reasonably have concluded, as the government argues, that Lamberti meant that Cangialosi would inform Soresi of the New York buyers' plans upon his return to Sicily. Two days before his arrest, Cangialosi, who was planning to return to Sicily, was asked by a person he identified as "Uncle Pino" whether he had "prepared the dirt for the tomatoes?" Cangialosi replied, "Almost." When asked "Will this thing be organized?", he answered, "Yes, yes." The jury could reasonably have concluded that Cangialosi was informing his relative that he was making arrangements for the New York buyers to receive shipments of narcotics from Sicily.
 
 
 69
 Cangialosi's meetings with Mazzurco, Salvatore Lamberti and others, especially in parking lots at night; his clear participation in their efforts to receive telephone calls from Soresi in Sicily; and both Salvatore Lamberti's reference to and his own oblique acknowledgment of his role as a go-between rationally support the conclusion that Cangialosi knowingly participated in the charged conspiracy.
 
 D. Casamento
 
 70
 Casamento contends that the record contains insufficient evidence to support the conclusion that he participated in the charged conspiracy. In our view, ample evidence supports the conclusion that, as a member of the conspiracy, Casamento purchased narcotics from defendant Giuseppe Ganci.
 
 
 71
 To begin with, the record clearly demonstrates that Ganci was a narcotics dealer. (See infra Points VIII, XVI.) Indeed, Casamento concedes that Ganci supplied heroin to defendant Benito Zito. Intercepted telephone messages reveal that, during the course of a six-month period in 1983, Casamento communicated with Ganci through brief, apparently coded messages using the same phrases Ganci used in other drug-related conversations, and, according to the testimony of agents, he was observed meeting with Ganci several times--in Ganci's car, in a park, in a store--for meetings which lasted up to twenty minutes. Given Ganci's role as a narcotics supplier, and the suspicious nature of Casamento's dealings with him, there was sufficient evidence from which the jury could reasonably conclude that Casamento engaged in narcotics transactions with Ganci.
 
 
 72
 A review of the evidence regarding one particular series of calls and meetings illustrates the range of evidence presented against Casamento. On August 6, 1983, Casamento called Ganci at home in Queens, New York, and asked him if they could meet the next day for five minutes. Ganci replied that "[i]f you need, even now." Casamento said he did not want to meet just then and they arranged to meet the next day. The next morning, Ganci was observed meeting Casamento at a store in Brooklyn, New York. After about twenty minutes in the store, Ganci and Casamento left, carrying boxes. They put the boxes in Ganci's car. Ganci then drove away alone.
 
 
 73
 Shortly after noon, Ganci called Mazzurco, his associate in narcotics dealing (see infra Point VIII), and told him that he needed "three of those checks." Later that afternoon, Mazzurco met Ganci and handed him a bag. After receiving the bag from Mazzurco, Ganci was observed driving home with it and carrying it into his house.
 
 
 74
 That night, shortly after ten o'clock, Casamento called Ganci's home and told Ganci's wife that he was coming over. A few minutes after eleven o'clock, Casamento arrived near Ganci's house. Casamento was observed looking around in every direction as he walked from his car to Ganci's house. Less than four minutes after entering Ganci's house, Casamento left. After leaving Ganci's house, according to the testimony of an agent who followed him, Casamento appeared to detect that he was being followed and began to drive in an evasive manner.
 
 
 75
 This series of events allows the reasonable inference to be drawn that Casamento purchased narcotics from Ganci, a dealer in narcotics. Clearly, the conclusion reasonably could be drawn that Casamento called Ganci to obtain a certain item and his short stay in Ganci's house suggests that he visited Ganci just to obtain it. The hour of his visit, the manner in which Casamento entered Ganci's house, and his evasive driving thereafter, in context, allow for inferences that illegal behavior occurred. The jury reasonably could infer, as the government argues, that the boxes Ganci received when he met Casamento at the store contained cash as payment for the item Ganci would later give Casamento. Similarly, it reasonably could be inferred by the jury that the bag Mazzurco delivered to Ganci contained narcotics. We conclude that the jury acted reasonably in finding Casamento to have been a member of the narcotics conspiracy.
 
 E. Castronovo
 
 76
 Castronovo was convicted on count one (conspiracy), count ten (continuing criminal enterprise), counts twelve, fourteen and fifteen (money laundering), and count sixteen (racketeering). On appeal, he challenges the sufficiency of the evidence against him only with regard to count ten. Castronovo claims that the government presented insufficient evidence to prove that, in the course of committing a series of narcotics violations, he organized, supervised or managed at least five individuals, in violation of 21 U.S.C. Sec. 848. We agree with Castronovo and therefore reverse his conviction on count ten.
 
 
 77
 The jury in its special verdicts found that Castronovo supervised six individuals: Salvatore Amendolito, Philip Matassa, and Antonino Rotolo, and defendants Olivero Tognoli, Salvatore Miniati and Adriano Corti. We conclude that insufficient evidence exists to demonstrate that Castronovo supervised Tognoli and Miniati, thus leaving only four who could have been supervised or managed.
 
 
 78
 Castronovo, who owned a restaurant in New Jersey, does not dispute that he participated in the conspiracy's money laundering scheme. Moreover, he concedes that Tognoli, a wealthy Italian industrialist, and Miniati, Tognoli's agent, were also participants in the scheme. In June 1980, Miniati, acting on behalf of Tognoli, hired Amendolito, an Italian who was resident in the United States, to transfer money from New York to Switzerland. Miniati instructed Amendolito to meet with Castronovo. Amendolito met with Castronovo, and thereafter Amendolito began a series of visits to Castronovo in New Jersey, during which Amendolito received large amounts of cash from Castronovo. Castronovo does not dispute that this money eventually was sent to Tognoli in Switzerland.
 
 
 79
 While the evidence demonstrates that Castronovo and Tognoli were part of the same conspiracy, the government points to no evidence which indicates that Castronovo was Tognoli's superior in the conspiracy's hierarchy. Nowhere, for example, does the record show that Castronovo ever gave Tognoli orders or even that Castronovo gave orders to someone who in turn managed Tognoli's activities. Cf. United States v. Cruz, 785 F.2d 399, 407 (2d Cir.1986); United States v. Mannino, 635 F.2d 110, 116-17 (2d Cir.1980).
 
 
 80
 To support its claim that Castronovo managed Tognoli, the government argues that "it was Castronovo who communicated the need for a pick-up" of accumulated cash to European members of the money laundering scheme. Castronovo's communicating the need for a pick-up of cash does not indicate that he was directing the activities of others; it merely shows that he was carrying out the role of a communicator in the conspiracy.
 
 
 81
 Several pieces of evidence suggest that Tognoli was at least Castronovo's equal in the conspiracy's hierarchy. First, on one occasion, when Tognoli and Matassa visited Castronovo's restaurant, Matassa testified that he heard Tognoli "raise his voice in agitation" while speaking to Castronovo. This incident suggests that Tognoli was not Castronovo's subordinate, since subordinates usually do not raise their voices in agitation while conversing with a superior.
 
 
 82
 On another occasion, Amendolito travelled to Montreal to meet with Tognoli, upon Tognoli's request. Amendolito testified that Tognoli "recommended" that Amendolito not inform Castronovo about the meeting. At LaGuardia Airport in New York City, Amendolito ran into Castronovo, who was also travelling to meet Tognoli. Amendolito testified that both he and Castronovo were embarrassed upon seeing each other, since they were each unaware that the other was flying to Montreal to meet Tognoli. Like the meeting at Castronovo's restaurant, this incident suggests that Tognoli was not Castronovo's subordinate. It seems to us that, assessing this evidence, the reasonable inference to be drawn was that if Castronovo were in charge he would have been informed by Tognoli that Amendolito was attending the Montreal meeting. Further, Amendolito testified that Castronovo "was just a delivery man." This remark further undermines the government's claim that Castronovo had a management role in the conspiracy.
 
 
 83
 In sum, we conclude that the record evidence is insufficient to establish that Castronovo supervised, organized, or managed the activities of Tognoli.
 
 
 84
 The government presents no evidence to show that Castronovo ever had any direct interactions with Miniati. Its argument that Castronovo supervised Miniati hinges on Miniati's role as Tognoli's agent. Since we have concluded that the evidence is insufficient to establish that Castronovo supervised Tognoli, we conclude that Miniati's role as Tognoli's agent does not suffice to establish that Miniati was supervised by Castronovo.
 
 
 85
 We conclude that the record contains insufficient evidence to show that Castronovo supervised two of the six individuals the jury found Castronovo to have supervised. Therefore, since the record lacks sufficient evidence to support the conclusion that Castronovo supervised the requisite five persons, we reverse Castronovo's conviction on the continuing criminal enterprise count.
 
 F. Greco
 
 86
 The jury convicted Salvatore Greco on counts one (conspiracy), twelve and fourteen (money laundering), and sixteen (racketeering). On appeal, Greco challenges the sufficiency of the evidence only with regard to the money laundering and racketeering convictions. We find Greco's challenge to be without merit.
 
 1. Money Laundering Counts
 
 87
 There is substantial record evidence from which the jury could rationally conclude beyond a reasonable doubt that Greco participated in the money laundering operation. Greco concedes "that there is good evidence" that defendants Filippo Salamone, Gaetano Mazzara and appellant Frank Castronovo were involved in money laundering, and that he associated with these three men. In March 1983, Filippo Salamone was responsible for shipping hundreds of thousands of dollars in cash to Switzerland. (See infra Point II(J).) The evidence suggests that by mid-June 1983, Filippo Salamone had sold his house and departed from the United States. An intercepted call to Salamone's former house after he departed reveals that Greco was occupying the house. Moreover, viewing the evidence in the light most favorable to the government, we believe it would have been reasonable for the jury to conclude that Greco was aware of Salamone's apparent departure. The government argues that Greco assumed Salamone's money laundering duties after Salamone's departure. Greco's presence in Salamone's former house, his knowledge of Salamone's departure, and Greco's subsequent activities, discussed below, support the government's contention.
 
 
 88
 A government agent testified that, on July 5, 1983, he saw Greco place two boxes in his car and drive to Castronovo's residence in New Jersey. On the morning of July 7, 1983, Ganci, the narcotics distributor (see infra Points II(D), VIII, XVI), was observed delivering two packages to Mazzara. Late that night, Mazzara met Greco in New Jersey. Greco was then observed driving to Brooklyn, where, upon meeting an unidentified individual, he took a box out of his car. Given Greco's concession that there exists "good evidence" of Mazzara's and Castronovo's participation in money laundering, and considering this in conjunction with the evidence recited below, we believe the jury could reasonably have concluded that on July 5 and 7 Greco, as part of the money laundering operation, delivered cash to Castronovo and an unidentified participant on those respective dates.
 
 
 89
 Another meeting which the jury could reasonably have concluded involved a delivery of cash by Greco occurred on August 24, 1983. Testimony based on surveillance revealed that on that day Greco travelled from New Jersey to New York and delivered a package to the pizzeria of defendant Rosario Dispenza in lower Manhattan. Before entering the pizzeria with the package, Greco looked up and down the street, and waited for a short time. A subsequent search of Dispenza's residence in Queens, New York, produced approximately $398,000 in cash. Dispenza also had a menu from Greco's pizzeria in his house, with the pizzeria's address and telephone number on it. On April 9, 1984, when he was questioned by a government agent, Greco denied ever having taken a package to Dispenza's pizzeria.
 
 
 90
 Further evidence to support Greco's money laundering activity was discovered on April 9, 1984, when government agents searched his home and car. The search revealed that in his kitchen Greco had empty money wrappers, which in total were designed to contain approximately $169,800. Greco also had $13,000 in cash in his car. A search of Greco's pizzeria that same day revealed a loaded Uzi rifle, a silencer compatible with the rifle, a loaded semi-automatic pistol, a Luger pistol and several magazines of ammunition.
 
 
 91
 We conclude that, when viewed in the light most favorable to the government, Greco's close association with Mazzara, Castronovo, and especially Filippo Salamone; evidence that he placed two packages in his car and drove to Castronovo's residence; his delivery of a package to Dispenza's pizzeria; his apparent delivery of a package to an unidentified individual; and the evidence of money, money wrappers, and guns in his home, considered together, provide sufficient evidence to rationally support his convictions on the money laundering counts.
 
 2. Racketeering Count
 
 92
 In attacking his RICO conviction, Greco claims that the government presented insufficient evidence to prove that he committed two racketeering acts. See H.J. Inc. v. Northwestern Bell Tel. Co., U.S. ----, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) (in a RICO prosecution, government must prove defendant committed at least two predicate acts); United States v. Benevento, 836 F.2d 60, 72 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988). Greco does not dispute that his participation in the narcotics conspiracy properly served as one racketeering act. See id. Rather, he argues that the government presented insufficient evidence to establish that, as a second racketeering act, he violated 18 U.S.C. Sec. 1952(a). In the indictment, it is alleged that Greco's delivery on August 24, 1983, of a package to Dispenza's pizzeria constituted a violation of Sec. 1952. Greco argues that the government failed to prove that this delivery constituted such a violation.
 
 
 93
 Section 1952(a)(3) prohibits an individual from travelling in interstate commerce with the intent to "promote" an "unlawful activity" and thereafter performing an act which promotes such an activity. Here, we conclude that the jury could reasonably have inferred that Greco's trip from New Jersey to New York on August 24, 1983 to make a delivery to Dispenza's pizzeria was part of the enterprise's money laundering operation. We base this conclusion on the evidence demonstrating Greco's role in the money laundering enterprise, discussed above; the cautious way in which Greco behaved before entering the pizzeria; the huge amount of cash found in Dispenza's home; and Greco's denial that he delivered the above-described package, which an agent testified he saw him deliver. Since sufficient evidence was presented from which a jury could reasonably conclude that the interstate delivery occurred and that it was part of the money laundering operation, a reasonable conclusion can be drawn that Greco travelled to Dispenza's pizzeria with the intent to promote the narcotics enterprise and that he thereafter did promote it by delivering the package. Having determined that the evidence provides a sufficient basis for the jury to rationally conclude that Greco committed two racketeering acts, we find his challenge to the RICO conviction to be without merit.
 
 G. Ligammari
 
 94
 The record contains sufficient evidence to support Ligammari's convictions on counts one (conspiracy) and sixteen (racketeering). The government alleges that, as a member of the conspiracy, Ligammari agreed to help fund the narcotics purchases of the New York group, a group which included Mazzurco, Ganci, and Giuseppe Lamberti. (See supra Points II(B), II(C), II(D), infra Points VIII, XVI). Two series of events in particular support a finding that Ligammari did join the conspiracy.
 
 
 95
 Intercepted telephone conversations disclose that, on February 13, 1984, Alfano, who sold imported narcotics to the New York group for Badalamenti (see supra Point II(B), infra Points II(H), II(L)), made airline reservations to fly from Chicago to New York the next morning. That night, Alfano told Mazzurco he would be arriving the next day and that Mazzurco should "[p]ut together some of those...." In the circumstances herein, the jury could reasonably have inferred that Alfano was requesting that Mazzurco gather money to pay for a narcotics shipment. Early on the morning of February 14, Giuseppe Lamberti called Ligammari, spoke of "that guy who is going to bring the plant," and asked Ligammari to meet that morning with certain unnamed persons. Less than two hours later, Ligammari, according to the testimony of an agent, met with Mazzurco, Ganci, Catalano and Giuseppe Lamberti in New York City. The jury could reasonably have inferred that the participants at this meeting met to discuss paying Alfano.
 
 
 96
 The second series of events began on February 23, 1984. On that day, in a coded telephone conversation between Mazzurco and Alfano about how much money would be paid to Alfano for delivered items, Mazzurco said "let me talk to those guys." That night, Mazzurco met with Ganci, Catalano and Ligammari at Ganci's house. Just past midnight, Mazzurco called Alfano and told him that he would receive some payment now but that Mazzurco did not know when more payments would be made. Mazzurco said: "If they're taking their time, what can I tell you?" The jury could reasonably have inferred that Mazzurco was referring to Ligammari and the others. Alfano urged Mazzurco to "[g]ive them a little push," and added that "[t]hese people shouldn't be doing this," to which Mazzurco replied, "Pietro, I'm just telling you, I'm reporting to you what they told me." Intercepted calls reveal that, the very next day, on February 24, Mazzurco spoke to Ligammari's son and told him to tell his father that "those people want 10." The son responded: "I don't think he'll be too happy about it." Mazzurco replied: "I know he wasn't too happy last night." The jury could reasonably have inferred that Mazzurco was referring to the meeting at Ganci's house.
 
 
 97
 Viewed in the light most favorable to the government, the meetings and telephone calls of February 13-14 and February 23-24 provide sufficient evidence to rationally support the jury's conclusion that Ligammari was guilty of counts one and sixteen.
 
 H. Palazzolo
 
 98
 The record contains sufficient evidence to support Palazzolo's convictions on counts one (conspiracy) and sixteen (racketeering). The jury could reasonably have relied upon evidence of two incidents to conclude that he knowingly participated in the narcotics conspiracy by acting as an assistant to Alfano, who was one of Badalamenti's representatives in the United States. (See supra Point II(B).)
 
 
 99
 First, on September 26, 1983, Palazzolo, along with Alfano and two other alleged subordinates of Badalamenti--defendants Vincenzo Randazzo and Faro Lupo--was observed meeting with Mazzurco in a restaurant in Queens, New York. Given Mazzurco's role as a buyer of narcotics (see supra Point II(B), infra Point VIII), the jury could reasonably have inferred that the meeting concerned narcotics trafficking. Further, the jury could reasonably have concluded from evidence concerning the rental car used that, after the meeting, Palazzolo drove with Alfano back to the Midwest.
 
 
 100
 The second incident was Alfano's delivery to Mazzurco on February 4, 1984. (See supra Point II(B).) The evidence suggests that Palazzolo drove with Alfano from Ohio to Queens, New York, to make the delivery. After the delivery, in a February 7 telephone call to Palazzolo's pizzeria in Wisconsin, Badalamenti spoke to Alfano in code about the delivery. Just over an hour later, Alfano's wife called the pizzeria, and the jury could reasonably have found from Palazzolo's coded discussion with her that he was well aware of the content and significance of the Badalamenti-Alfano conversation.
 
 
 101
 One further bit of evidence against Palazzolo was the unloaded gun which he concedes he kept in his house. Though there is no claim that possession of this gun was illegal, it may nonetheless be considered probative of Palazzolo's involvement in the narcotics conspiracy, if the jury chose to so view it. See United States v. Mourad, 729 F.2d 195, 201 (2d Cir.) (gun found in defendant's home is probative of narcotics conspiracy), cert. denied, 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984).
 
 I. Polizzi
 
 102
 Polizzi argues that the record contains insufficient evidence to support his convictions on counts one (conspiracy) and sixteen (racketeering). We do not agree. As to count one, surveillance evidence and taped telephone conversations provide a rational basis from which a fact-finder could conclude that Polizzi was a member of the narcotics conspiracy, who helped Ganci arrange to receive narcotics-related telephone calls from Sicily, and who provided funds to help Ganci and Mazzurco purchase narcotics. (See infra Point XVI.)
 
 
 103
 In attacking his RICO conviction, Polizzi argues that the government failed to establish that he committed two racketeering acts. This argument lacks merit. Once the jury found Polizzi had participated in the narcotics conspiracy charged, it could properly find that such participation served as one of the two predicate acts required for Polizzi's conviction on count sixteen. See United States v. Benevento, 36 F.2d 60, 72 (2d Cir.1987) ("Conspiracies to violate the narcotics laws ... are properly chargeable as predicate acts."), cert. denied, --- U.S. ----, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988). The second predicate act commenced with a telephone call between Ganci and Polizzi on March 13, 1983, in which Ganci reported to Polizzi that he (Ganci) was going to receive a call from a public telephone near Polizzi's home. Since Polizzi was involved in arranging these overseas narcotics-related calls, his speaking on the telephone with Ganci about the arrangements for such a call constitutes use of a facility in interstate commerce with the intent to facilitate the carrying on of an unlawful activity. Polizzi met Ganci at a public telephone in New Jersey at least once after March 13, 1983, to wit, on April 28, 1983. (See infra Point XVI.) This meeting with Ganci allowed the jury to reasonably conclude that Polizzi, after March 13, committed a further act to facilitate the conspiracy. Polizzi's March 13 use of the telephone and his meeting with Ganci thereafter could be found to constitute a violation of 18 U.S.C. Sec. 1952(a)(3). Thus, a trier of fact could reasonably have found that Polizzi committed two predicate acts, as 18 U.S.C. Sec. 1962 requires, hence, we conclude that Polizzi's conviction on count sixteen is sufficiently supported by record evidence and must be sustained.
 
 J. Salamone
 
 104
 Appellant Salamone, who was acquitted on counts one and sixteen, claims that the record contains insufficient evidence to support his convictions on count twelve (conspiring to transport money out of the United States without filing required currency reports), count thirteen (the making of false statements to the Internal Revenue Service with regard to various cash deposits or aiding and abetting same), and count fourteen (the failure to file required currency reports or aiding and abetting same). The evidence, discussed below, indicates that Salamone assisted in the operation of the money laundering scheme, the existence of which he does not dispute. We conclude that the evidence was sufficient to permit a jury to rationally conclude that Salamone conspired to violate, and aided and abetted the violation of, the various currency reporting statutes on which counts twelve, thirteen and fourteen are based.
 
 
 105
 Salamone's main involvement in the money laundering operation was to change small denominations of cash to larger denominations, a task carried out at his request by two waitresses in his pizzeria and by a sales representative of a pizza supply company with whom Salamone had contact; each of these persons so testified. Salamone's orders to the waitresses not to change over $10,000 in any one bank so as to avoid having to sign any documents and to leave the bank if questioned about the purpose of their visit provided a sufficient basis for the jury to reasonably conclude that Salamone knew he was involved in an illegal activity.
 
 
 106
 The evidence reveals that Salamone's money changing activities occurred in the summer and fall of 1982 and were part of a broader money laundering operation; this is made evident by Salamone's contact with his brother, defendant Filippo Salamone ("Filippo"). The jury could reasonably have found that Filippo was a major participant in the money laundering operation; the record indicates that in March 1983 Filippo sent $400,000 in cash to Switzerland, to defendant Franco Della Torre, whom Salamone describes as "the kingpin in all the financial transactions involved in the heroin scheme." The sales representative who changed money for him testified that, at one point, Salamone told him that he (the representative) could give the large bills he received from the bank to Filippo if Salamone was not at the pizzeria. Indeed, at one point Filippo himself asked the sales representative when he (the representative) would be changing money. The jury could reasonably infer from Salamone's willingness to have the cash go to Filippo and Filippo's own questioning of the sales representative that Filippo was an interested party to the cash exchanging activity.
 
 
 107
 On another occasion, according to one of the waitress witnesses, during the summer of 1982, Filippo joined Salamone and four visitors from Switzerland for dinner at the pizzeria. The record evidence also shows that Salamone travelled to Switzerland, and that he met with Filippo while there.
 
 
 108
 Salamone's money exchanging activities, and his connections with Filippo and with people from Switzerland provide sufficient evidence from which a fact-finder could reasonably conclude that Salamone assisted in the money laundering operation charged, i.e., knew of the scheme and participated therein. We find there is sufficient evidence to support his convictions.
 
 K. Trupiano
 
 109
 Trupiano contends that the record contains insufficient evidence to support the conclusion that he was a member of the narcotics ring. We agree and therefore reverse his convictions on counts one (conspiracy) and sixteen (racketeering).
 
 
 110
 In support of Trupiano's convictions, the government argues that he was aware of and participated in the conspiracy. Pointedly, the government identifies an intercepted telephone conversation in which Alfano asked Trupiano whether he would "like to take a walk?" Viewed in the light most favorable to the government, Alfano appears to have been asking Trupiano whether he would act as a drug courier. In response to Alfano's request, Trupiano implied that he might go on the requested trip for Alfano if, in Trupiano's words, Alfano could send his "daughter or someone to stay here with my wife." At the end of the conversation, however, Trupiano told Alfano that he would not go on the trip. Finally, the government points to the fact that when he was arrested Trupiano had an unloaded gun in his possession.
 
 
 111
 Even viewed in the light most favorable to the government, we conclude that the evidence was insufficient to establish beyond a reasonable doubt that Trupiano was a member of the conspiracy. An individual is not a conspirator merely because he is aware of a conspiracy and associates with its members. See United States v. Nusraty, 867 F.2d 759, 763 (2d Cir.1989); United States v. Young, 745 F.2d 733, 764 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); United States v. Garcia-Duarte, 718 F.2d 42, 46 (2d Cir.1983). To be a conspirator, an individual must agree to participate in the conspiracy. United States v. Delvecchio, 816 F.2d 859, 864 (2d Cir.1987); United States v. Cepeda, 768 F.2d 1515, 1516 (2d Cir.1985). Here, the record contains insufficient evidence that Trupiano agreed to participate in the charged conspiracy. While, during his intercepted conversation with Alfano, Trupiano implied that he might agree to act as a courier if Alfano met his conditions, he ultimately told Alfano that he would not agree to go on the "walk." Moreover, the fact that Trupiano possessed an unloaded gun when arrested, without more, does not prove that he was a conspirator. See Young, 745 F.2d at 764 (evidence against defendant insufficient on narcotics conspiracy charge despite fact that an M-16 rifle was found concealed in her apartment).
 
 
 112
 Since the record contains insufficient evidence that Trupiano agreed to join the conspiracy, his conviction on count one must be reversed. Trupiano's conviction on count sixteen must also fall, since, as the discussion above indicates, there is insufficient evidence to support the conclusion that Trupiano participated in the drug trafficking enterprise charged.
 
 L. Vitale
 
 113
 Vitale claims that the record contains insufficient evidence to support his convictions on counts one (conspiracy) and sixteen (racketeering). Specifically, he argues that the record contains insufficient evidence to show (1) that telephone conversations he had with defendant Pietro Alfano concerned narcotics; (2) that he knowingly agreed to participate in the narcotics conspiracy; (3) that he participated in the conspiracy charged; and (4) if he did agree to facilitate a narcotics transaction, that he had sufficient knowledge of the overall conspiracy to be considered a member of it.
 
 
 114
 The record concerning Vitale includes the following evidence. During the morning of March 8, 1984, Alfano called Vitale and asked him, "[A]re you going to take a walk?" When Vitale asked where, Alfano said, "Where we had gone that time.... From there to the big city." Vitale asked, "Where we went on the last trip?" and Alfano answered "Yes." In discussing the trip Alfano seemed to be proposing, the two discussed the possibility of Vitale flying. Alfano stated that if Vitale drove, the trip would take two days. The conversation ended with Alfano telling Vitale to think about taking the trip.
 
 
 115
 About forty minutes later, Vitale called Alfano and said, "Tell me what I should do. I'm ready to do whatever you say." Later in the conversation he said, "When should I leave?" Alfano told him, "As soon as I call, you leave." "Okay," Vitale responded. The next day in another telephone conversation, Alfano said to Vitale, "[T]his thing has just come up ... they were supposed to go. Remember those guys from last time?" Vitale responded, "Yeah."
 
 
 116
 The government argues that in calling Vitale on March 8, Alfano was seeking to enlist his services as a courier to carry cocaine from Florida to New York. The evidence strongly supports the government's contention that the telephone conversations concerned narcotics and a factfinder could rationally so find. Vitale concedes that Alfano participated in the narcotics conspiracy charged, and the record contains sufficient evidence to establish that Badalamenti imported narcotics into the United States. (See supra Point II(B).) On February 8, 1984, according to intercepted telephone calls, Badalamenti told Mazzurco to expect a shipment of "parcels" to Fort Lauderdale, Florida. Then, on February 28, Badalamenti told Alfano that more than one driver would be needed. From this evidence, it was reasonable for the jury to infer that the trip Alfano proposed to Vitale was one to pick up a narcotics shipment; also, the coded nature of the telephone conversations in the overall context of this case supports the inference that the conversations concerned illegal activity involving narcotics.
 
 
 117
 From the conversations themselves, it is clearly inferable that Vitale knew the purpose of the trip Alfano was proposing and that he agreed to go on the trip. Vitale's reference to a prior trip, his memory of "those guys from last time," and his failure to ask about the purpose of the proposed trip while discussing the prospect of taking it, all strongly suggest that Vitale knew what Alfano wanted him to do and a jury could rationally so find. Moreover, Vitale's saying "I'm ready to do whatever you say," and his asking when he should leave could sufficiently establish that he agreed to perform the service Alfano requested. Once Vitale agreed to take the trip he became a member of the conspiracy. That Vitale may never have taken the trip has no bearing on whether he joined the conspiracy charged. See United States v. Delvecchio, 816 F.2d 859, 864 (2d Cir.1987) ("no overt act need be alleged or proven as a necessary element of conspiracy under 21 U.S.C. Sec. 846.").
 
 
 118
 Finally, we reject Vitale's argument that he had insufficient knowledge of the conspiracy to be considered a part of it. To become part of a conspiracy, a defendant need not know every aspect of it, but need only know that a common unlawful endeavor exists. United States v. Nusraty, 867 F.2d 759, 763 (2d Cir.1989). Here, viewed in the light most favorable to the government, the evidence may reasonably be construed as establishing that Vitale knew he was being asked to act as a courier. As a go-between, a courier must know that he is acting in the service of a common endeavor between at least two parties. Vitale's reference to an earlier trip and his memory of "those guys from last time" suggest that he knew he was not involved in an isolated transaction. The evidence was sufficient for a rational fact-finder to conclude that Vitale had knowledge of a common unlawful endeavor, and that he became a co-conspirator when he called Alfano and agreed to take the trip Alfano proposed.
 
 III. Statements by Carlo Castronovo
 
 119
 Castronovo argues that the district court erred in admitting certain statements. We conclude that the court did not err.
 
 
 120
 At trial, Salvatore Contorno, a witness for the government, testified about certain statements that he claimed had been made to him by one Carlo Castronovo ("Carlo"). Contorno testified that Carlo told him that (1) he (Carlo) was dealing in drugs with a cousin in the United States named Ciccio Castronovo and (2) that Ciccio Castronovo used pizza restaurants as a front for his drug trafficking. According to Contorno, Carlo invited Contorno to participate in the drug business. According to an interpreter who translated at the trial, "Ciccio" is a diminutive of "Francesco." Appellant Frank (Francesco) Castronovo makes no argument that the reference to Ciccio Castronovo was not a reference to himself.
 
 
 121
 The trial judge ruled that Carlo's first statement, regarding his claimed drug dealing with Castronovo, was admissible as a statement against penal interest under Fed.R.Evid. 804(b)(3) and that Carlo's second statement, regarding Castronovo's alleged use of pizzerias as fronts, was admissible as a statement by a co-conspirator under Fed.R.Evid. 801(d)(2)(E).
 
 A. First Statement
 
 122
 Castronovo makes a three-pronged attack on the admission of Carlo's first statement. He argues that Carlo Castronovo was not an unavailable declarant, that no corroborating circumstances existed to indicate the trustworthiness of the statement, and that the reference to Castronovo as a drug dealer was not against Carlo's penal interest. We address these claims in turn.
 
 1. Unavailability
 
 123
 Castronovo claims that Carlo was not "unavailable" as a witness under Fed.R.Evid. 804(a) or for the purposes of the confrontation clause of the sixth amendment. He argues that the government's effort to obtain Carlo as a witness was inadequate and, further, that the effort was flawed since it came after the start of the trial.
 
 
 124
 At the time of trial, Carlo was incarcerated in an Italian prison. The government represented to the district court that, at some point between September 30, 1985, the date the trial began, and December 17, 1985, the date of an affidavit filed by the government in response to claims that Carlo was not unavailable, an Assistant United States Attorney spoke to the Director of Italy's Office of Extradition. The Director told the prosecutor that Italy would not extradite Carlo. According to the government's affidavit, the government believed that the position taken by Italy--that Italy had a right to refuse extradition--was "sound."
 
 
 125
 For purposes of Rule 804, a declarant is unavailable when the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance ... by process or other reasonable means." Fed.R.Evid. 804(a)(5) (emphasis added). For purposes of the confrontation clause, a declarant is unavailable when the declarant is absent "despite good-faith efforts undertaken prior to trial to locate and present that witness." Ohio v. Roberts, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980). The length to which the confrontation clause requires the prosecution to go to produce a witness is "a question of reasonableness." Id. at 74, 100 S.Ct. at 2543 (quoting California v. Green, 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring)).
 
 
 126
 We conclude that the extent of the government's effort to obtain Carlo was both reasonable and undertaken in good faith--as is implied by the district court's ruling--and therefore satisfied both Rule 804 and the confrontation clause. Having been told by the Italian authority responsible for extraditions that Italy would not extradite Carlo, the government had no obligation to take any further action. Castronovo implies that the government should have made a formal written request for Carlo's extradition. While utilizing this formal approach perhaps would have been preferable, such a request would most likely have been futile and "[t]he law does not require the doing of a futile act." Roberts, 448 U.S. at 74, 100 S.Ct. at 2543. The government's statement in its affidavit that it believed Italy's position was sound was not unreasonable and the statement sufficed to establish that the government made a "good-faith effort[ ]," id., despite the fact that it limited itself to a single conversation with the responsible Italian official in its effort to procure Carlo for trial.
 
 
 127
 In arguing that the admission of the statement violated the confrontation clause, Castronovo also points out that the government's effort to obtain Carlo's presence was made after the start of the trial. We note that the Supreme Court in Roberts, 448 U.S. at 74, 100 S.Ct. at 2543, did use the language "efforts undertaken prior to trial" in discussing the test for determining whether the prosecution had made a good-faith effort to obtain the declarant's presence at trial. However, we do not believe the Court intended the timing of the government's effort in relation to the start of the trial to be a crucial element of the test. In its discussion of the test in Roberts, 448 U.S. at 74-77, 100 S.Ct. at 2543-45, the Court focused on the extent of the government's effort, and nowhere indicated that it considered the timing of the government's effort to be of particular significance.
 
 
 128
 Moreover, we believe that in a case such as this, in which the government's case-in-chief was massive and took many months to present, it would impose an undue burden upon the government to require it to make all of its efforts to obtain the presence of all declarants before the start of the trial. In such a complex trial, the prosecution may not be aware before the trial begins of all the declarants whose statements it may later seek to have admitted into evidence. Thus, we hold that in this case Carlo was unavailable for purposes of Rule 804 and the confrontation clause, although the government's effort to procure him was made after the trial began.
 
 2. Corroborating Circumstances
 
 129
 Next, Castronovo claims that the admission of Carlo's first statement violated Fed.R.Evid. 804(b)(3) since, in his view, no corroborating circumstances existed to indicate the trustworthiness of the statement. Castronovo argues that Contorno was inclined to testify falsely in the government's favor. In addition, he argues that Carlo most likely would not have made such a statement to Contorno, who, Castronovo argues, was a "virtual stranger" to Carlo.
 
 
 130
 Although Rule 804(b)(3) requires the presence of corroborating circumstances only in the case of statements "tending to expose the declarant to criminal liability and offered to exculpate the accused," this Circuit requires corroborating circumstances even when the statement is offered, as here, to inculpate the accused. See United States v. Stratton, 779 F.2d 820, 828 n. 7 (2d Cir.1985), cert. denied, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986). In determining whether such a statement is trustworthy enough to be admissible, the district court must look to the circumstances in which the declarant made the statement. However, the court should not look to the credibility of the in-court witness. See United States v. Katsougrakis, 715 F.2d 769, 777 (2d Cir.1983), cert. denied, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Assessing the credibility of an in-court witness is the role of the jury. Therefore, we reject as not pertinent to the evidentiary ruling Castronovo's argument that Contorno was inclined to lie. Castronovo asserts that Contorno was a "virtual stranger" to Carlo. The district court concluded otherwise, finding for purposes of its evidentiary ruling that Carlo and Contorno had worked together as cigarette smugglers and cattle dealers. Badalamenti, 626 F.Supp. at 662. We conclude that the court did not err in making this determination. Therefore, since Carlo was a former business associate, and we perceive no reason from the evidence in the record for him to have lied or attempted to curry favor, we conclude that the circumstances in which the statement was made indicate that it was sufficiently trustworthy to be admitted.
 
 3. Against Penal Interest
 
 131
 Castronovo argues that the district court erred in admitting that portion of Carlo's first statement which referred to Castronovo, since it was not against Carlo's penal interest to say that Castronovo was dealing drugs. Castronovo concedes that the portion of Carlo's statement relating to Carlo's drug dealing was against Carlo's penal interest, but he argues that only that portion of it, and not the whole statement, satisfied the requirement of Rule 804(b)(3) that the statement must "tend[ ] to subject the declarant to civil or criminal liability." We do not agree.
 
 
 132
 In admitting a statement as against the penal interest of the declarant, the district court need not excise those portions which refer to others. See Stratton, 779 F.2d at 828 (statement by declarant inculpating himself and three other defendants admissible against the three others under Rule 804(b)(3)). Admitting the entire statement even though it contains a reference to others is particularly appropriate when that reference is closely connected to the reference to the declarant. See 4 J. Weinstein & M. Berger, Weinstein's Evidence p 804(b)(3), at 137-38 (1988) (admitting portions of the statement closely connected to the declaration against interest is approach "best calculated to carry out the design of the draftsmen of Rule 804(b)(3)"). In Carlo's statement that he was dealing drugs with Castronovo, the reference to Carlo's drug dealing is so closely linked to the reference to Castronovo's drug dealing that the admission of the entire statement was clearly proper. In sum, we conclude that the district court committed no error in admitting Carlo's first statement.
 
 B. Second Statement
 
 133
 Castronovo claims that the district court erred in admitting Carlo's second statement--regarding Castronovo's use of pizzerias as a front--because, he argues, insufficient evidence existed to show that Carlo's statement was "by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).
 
 
 134
 We find this argument unpersuasive. In determining whether for purposes of Rule 801(d)(2)(E) the declarant is a co-conspirator of a party, a court may look to the statements of the declarant. Bourjaily v. United States, 483 U.S. 171, 180-81, 107 S.Ct. 2775, 2781-82, 97 L.Ed.2d 144 (1987). Here, Carlo's statement that he and Castronovo were dealing in drugs together presented key evidence that Carlo and Castronovo were co-conspirators. Carlo's invitation to Contorno to join the conspiracy presents strong evidence that Carlo's remarks were made to Contorno in furtherance of the charged conspiracy.
 
 
 135
 Evidence independent of Carlo's statements lends further support to the conclusion that Carlo's statements satisfied the requirement of Rule 801(d)(2)(E). For example, evidence in the record shows that in early 1980 Castronovo attended a meeting in Bagheria, Sicily, at which a quantity of heroin was tested. The district court found that Salvatore Greco also attended the meeting, as a representative of the Mafia family to which Carlo belonged. This finding, which we do not believe to be clearly erroneous, further supports the conclusion that Castronovo and Carlo were co-conspirators.
 
 
 136
 In attacking the evidence as insufficient to satisfy Rule 801(d)(2)(E), Castronovo argues that the evidence proved events which occurred after Carlo made the statement at issue, and that this evidence could not be used to prove the conspiracy existed at the time the statement was made. We do not agree. Post-statement events may be used to prove that a statement was made during the course of a conspiracy. See United States v. Kaplan, 832 F.2d 676, 685 (1st Cir.1987), cert. denied, 485 U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988). Having considered Carlo's statements along with the other evidence discussed by the district court, 626 F.Supp. at 663, we conclude that the court did not err in determining that the requirement of Rule 801(d)(2)(E) was satisfied. In sum, the court properly admitted Carlo's statements.
 
 IV. Admission of the Cocilovo Evidence
 
 137
 As part of its rebuttal, the government presented evidence that on June 6, 1983, in Miami, Florida, two police officers seized approximately six kilograms of cocaine and a piece of paper with appellant Mazzurco's telephone number on it from a person named Guido Cocilovo. The government also presented a customs document, seized from Mazzurco's residence, which indicated that Cocilovo had shipped certain goods from Italy to Miami.
 
 
 138
 On appeal, Catalano, Mazzurco, and Giuseppe and Salvatore Lamberti claim that the district court erred in admitting this evidence. Appellants argue that the evidence did not rebut any of the evidence presented by the defense, but merely bolstered the government's case, and therefore should not have been admitted. We are not persuaded by appellants' argument. The function of rebuttal evidence is to explain or rebut evidence offered by the other party. United States v. Neary, 733 F.2d 210, 220 (2d Cir.1984). A district court has wide discretion over what evidence may be presented on rebuttal. United States v. Nussen, 531 F.2d 15, 20 (2d Cir.), cert. denied, 429 U.S. 839, 97 S.Ct. 112, 50 L.Ed.2d 107 (1976). Here, we conclude that the district court acted within its discretion in admitting the evidence relating to Cocilovo.
 
 
 139
 Mazzurco testified in his own defense. During his cross-examination, Mazzurco stated that he had worked as a broker in the business of importing precious stones. Implicitly, he denied that he had any connection to narcotics trafficking. The evidence relating to Cocilovo served to rebut Mazzurco's claim that he was an importer of legitimate goods. By linking Mazzurco to Cocilovo, who clearly was involved both in importing activities and drug trafficking, the evidence cast doubt on Mazzurco's claim of innocence. Since the Cocilovo evidence served to rebut the defense presented by Mazzurco, we rule that the district court did not abuse its discretion in admitting this evidence during the government's rebuttal case.
 
 V. The Depositions Taken in Switzerland
 
 140
 During a six-day period in June 1985, the government deposed a number of witnesses in Switzerland. On appeal, Castronovo claims that three of these depositions should not have been admitted into evidence. Greco claims that the deposition of Paul Waridel should not have been admitted.
 
 A. Cross-Examination of Waridel
 
 141
 First, appellants argue that the admission into evidence of the deposition of Paul Waridel, who was then incarcerated in Switzerland and facing criminal charges there, violated their rights under the confrontation clause of the sixth amendment and under 18 U.S.C. Sec. 3503(d)(2). In essence, appellants argue that they were not given sufficient advance notice that Waridel's deposition would be taken and that, during the deposition, the Swiss judge who presided did not give them sufficient time to cross-examine the deponent. We reject these arguments.
 
 
 142
 On June 3, 1985, the prosecution applied to the district court for authorization to take the depositions in Switzerland. In making its application, the prosecution stated its theory of Waridel's role in events relevant to the government's case. The prosecution stated that Waridel had an "instrumental" role in the conspirators' efforts to collect the proceeds of their drug sales, and that he was
 
 
 143
 present at meetings in Switzerland where the specific details of the cash collection in New York ... were made and the particulars as to where the money was going in Switzerland and the purpose that it was to be used for, which again we believe will be the financing of heroin deals in the 1980, 1982 period.
 
 
 144
 On June 5, 1985, the district court ordered that the government arrange with Swiss authorities to take the deposition of Waridel and others during the week of June 10, 1985.
 
 
 145
 The Waridel deposition was taken on June 14, 1985. The presiding Swiss judge allowed the government to examine Waridel for two and one-half hours. Waridel testified about various meetings and financial transactions and his dealings with Musullulu, the alleged morphine base supplier in Turkey. Following Waridel's direct examination, the judge indicated that the defense collectively would have as much time for cross-examination as the government had for direct, plus a little more time "if need be." The seven defense counsel present then stated that they could not adequately cross-examine the witness because they were not sufficiently prepared and because they were not being allowed sufficient time to question him. Speaking for himself and the other defense counsel, counsel for Castronovo stated that an adequate examination would probably take at least two or three days. Despite this protest, counsel for Catalano proceeded to cross-examine Waridel for approximately two and one-half hours. Following the cross-examination by Catalano's counsel, the other defense counsel declined to question Waridel in the time that remained. Counsel refused to question Waridel even after the Swiss magistrate stated that he would give counsel "the time necessary to put some questions to the witness." The defense counsel, although complaining of lack of time for adequate cross-examination, made no proffer to indicate what areas of inquiry they would pursue were more time available.
 
 
 146
 The confrontation clause of the sixth amendment "guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Kentucky v. Stincer, 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987) (emphasis in original) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam)). Here, eleven days before the Waridel deposition was taken, defense counsel were informed of what the government expected would be the content of Waridel's testimony. While defense counsel understandably would have preferred more time to prepare for Waridel's deposition, we are satisfied that the notice they were given was sufficiently in advance of the deposition date so as not to deny the appellants an opportunity for effective cross-examination.
 
 
 147
 Similarly, we conclude that the amount of time allotted to the defense to conduct cross-examination of Waridel did not deny appellants the opportunity for effective cross-examination. We note that the extent of cross-examination lies within the discretion of the judge, United States v. Blanco, 861 F.2d 773, 781 (2d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989), and that a judge "abuses his discretion in curtailing cross-examination of a government witness when the curtailment denies the jury 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.' " Id. (quoting United States v. Singh, 628 F.2d 758, 763 (2d Cir.), cert. denied, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980)). Here, defense counsel collectively had over two and one-half hours to cross-examine Waridel. While, understandably, defense counsel would have preferred to have more time to probe every aspect of Waridel's testimony, on these facts, appellants were not unconstitutionally denied sufficient time for cross-examination. In two and one-half hours, counsel for the defense surely could have elicited, and counsel for Catalano to some extent did elicit, information from Waridel to suggest that Waridel might have had a motive for testifying falsely. Moreover, defense counsel made no proffer to indicate what areas of inquiry they would pursue if they had had more time. See Jones v. Berry, 880 F.2d 670, 673-74 (2d Cir.1989); Harries v. United States, 350 F.2d 231, 236 (9th Cir.1965) (no abuse of discretion in limiting cross-examination when, inter alia, counsel made no offer of proof as to additional facts expected to be elicited from the witness). Since one defense counsel used the allotted time effectively in an effort to impeach the deponent's credibility and additional time apparently was available to other counsel, we conclude that appellants were not prejudiced by the fact that every defense counsel was not guaranteed time to challenge Waridel to the extent they deemed sufficient. Cf. United States v. Partin, 524 F.2d 992, 1000 & n. 20 (5th Cir.1975) (district court's refusal to allow both of defendant's attorneys to cross-examine witness did not deprive defendant of his sixth amendment right to confrontation), cert. denied, 425 U.S. 904, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1976). Under the circumstances, we conclude that no sixth amendment violation occurred herein.
 
 
 148
 Appellants also claim that the admission of the Waridel deposition violated 18 U.S.C. Sec. 3503(d)(2). This provision requires that when a deposition is taken in a criminal case, "the scope of examination and cross-examination shall be such as would be allowed in the trial itself." Appellants argue that the extent of cross-examination at a trial would have been greater than was allowed at the Waridel deposition, and, therefore, that the admission of the deposition violated the statute. Appellants' argument is not persuasive; we disagree with appellants' premise that at a trial defense counsel necessarily would have been permitted to cross-examine Waridel to a greater extent than occurred at the taking of the deposition. As has been discussed, counsel were afforded an adequate opportunity to elicit information from Waridel to suggest that he might have had a motive for testifying falsely. See Blanco, 861 F.2d at 781. Moreover, defense counsel made no proffer to indicate what areas of inquiry they would pursue had they been permitted more time. See Jones, 880 F.2d at 673-74; Harries, 350 F.2d at 236. In light of these facts, there is no basis for us to conclude that the cross-examination of Waridel was of a lesser scope than "would be allowed in the trial itself." Therefore, the admission of the deposition into evidence did not violate Sec. 3503(d)(2).
 
 B. Unavailability of Waridel
 
 149
 Castronovo argues that the admission of the Waridel deposition violated 18 U.S.C. Sec. 3503(f) since Waridel was willing to testify at trial. This argument lacks merit.
 
 
 150
 Section 3503(f) provides that a deposition may be used at trial "if it appears: ... that the witness is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition." Here, Waridel, incarcerated in a Swiss prison, was "out of the United States." Moreover, his presence in Switzerland was procured by Swiss authorities, not by the United States government. Since the requirements for admissibility set forth in Sec. 3503(f) were met here, no violation of that provision occurred. Whether Waridel would have been willing to testify at trial is not pertinent to our analysis.
 
 
 151
 C. Absence of Oath or Pre-Testimony Affirmation
 
 
 152
 Finally, Castronovo argues that the depositions of Waridel, Franco Della Torre and Adriano Corti should not have been admitted since the presiding Swiss judge did not administer an oath or affirmation to these deponents before they testified. We find this argument unpersuasive.
 
 
 153
 The presiding Swiss judge did not administer an oath or affirmation to the deponents before they testified because the deponents were facing criminal charges in Switzerland and Swiss law does not allow those facing criminal charges to take an oath before testifying. Although none of the deponents took an oath or made an affirmation, each stated at the beginning of his examination that he would tell the truth. Della Torre made such a statement sua sponte and Waridel and Corti in response to a question by the prosecuting attorney. At the end of each deponent's testimony, a special master from the United States, Honorable Edmund L. Palmieri, appointed by Judge Leval to serve as an advisor to the Swiss authorities, asked each deponent the following question:
 
 
 154
 Can you solemnly affirm that all the answers you have given in this proceeding represent the truth and nothing but the truth to the best of your information and belief and do you so affirm with the same force and effect as if you had been formally sworn to tell the truth?
 
 
 155
 Each deponent answered in the affirmative. In a report to the district court, the special master wrote, "I was deeply impressed by the respectful attitude of the witnesses and their attorneys towards the Swiss judge and it occurred to me on more than one occasion that they were deeply impressed by the solemnity of the proceedings and the necessity to testify truthfully."
 
 
 156
 Castronovo correctly points out that Fed.R.Civ.P. 30(c), which under 18 U.S.C. Sec. 3503(d) governs the taking of depositions in criminal cases, requires that "[t]he officer before whom the deposition is to be taken shall put the witness on oath," and that Fed.R.Evid. 603 requires that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation." However, as this court made clear in United States v. Salim, 855 F.2d 944 (2d Cir.1988), a deposition taken in a foreign country may be admissible in a criminal trial in the United States despite the deposition's having been taken in a manner which does not strictly accord with federal law. In Salim, the court held that such a deposition would be admissible "unless the manner of examination required by the law of the host nation is so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable." Id. at 953. In our view, the testimony given by Waridel, Della Torre and Corti was not "inherently unreliable." The promises given by the deponents to tell the truth, the affirmations the deponents gave at the end of their examination, and the respectful attitude the deponents displayed toward the proceedings persuade us that the testimony given was sufficiently reliable to be admissible.
 
 
 157
 Having considered all of appellants' arguments with regard to the Swiss depositions, we do not find them persuasive.
 
 VI. Bagheria Meeting
 
 158
 In its opening statement, the government asserted that in February 1980, several of the defendants, including Greco, met in Bagheria, Sicily, to test some heroin which they were planning to buy. In his opening statement, Greco denied that he had attended the meeting. Subsequently, the government presented Greco with a demand for an alibi. In the alibi demand, dated October 30, 1985, the government asserted that the Bagheria meeting occurred "sometime shortly prior to approximately February 14, 1980." Shortly after issuing the alibi demand, the government came upon evidence--in the form of records from a travel agency and a series of checks signed by Greco--which strongly suggested that Greco had been in the United States in February 1980. Meanwhile, Greco had responded to the alibi demand by asking the government to specify on which date the government alleged the meeting occurred. Responding to Greco in a document dated November 19, 1985, the government stated that "[b]ased upon the present state of the evidence, the Government can specify that the testing session occurred ... sometime between approximately February 1, 1980 and March 15, 1980."
 
 
 159
 On December 18, 1985, during the trial, the prosecution asked Salvatore Contorno, a government witness, when in 1980 the Bagheria meeting occurred. Contorno testified that it occurred in "February, March."
 
 
 160
 Later in the trial, out of the presence of the jury, in an effort to prove that Contorno originally told the government that the Bagheria meeting had occurred on or before February 14, 1980 and that Contorno's testimony that the meeting occurred in "February, March" was a fabrication, Greco offered (1) the government's alibi demand as proof, and also offered (2) to call to the stand Robert Stewart, the Department of Justice attorney who signed the alibi demand. In response to Greco's offers, Judge Leval asked Stewart what caused the government to believe at the time it made its alibi demand that the Bagheria meeting occurred sometime before February 14, 1980. Stewart responded that the government believed that the meeting occurred at that time because appellant Castronovo, who it believed attended the meeting, left Sicily on February 14, 1980 and because another meeting, which the government believed followed the Bagheria meeting, occurred in Palermo, Sicily, on the same day. The judge also asked Stewart whether Contorno had ever told the government anything different regarding the date of the Bagheria meeting from what he said on the witness stand. Stewart replied in the negative. The district judge then sustained the government's objections to Greco's two offers. In addition, the judge stated that in his summation, Greco would be allowed to argue to the jury that Contorno's testimony was fabricated, so long as the argument was based on evidence in the record.
 
 
 161
 On appeal, Greco argues that the district court committed reversible error when it refused to admit into evidence the alibi demand and refused to allow him to call Stewart as a witness. We conclude that the court's ruling was not erroneous.
 
 
 162
 Unless made in excess of sound discretion, evidentiary rulings of the sort here challenged will not be disturbed on appeal. United States v. Blanco, 861 F.2d 773, 781 (2d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989). Here, the district court did not exceed its discretion in denying Greco's request to admit the alibi demand or to call Stewart as a witness.
 
 
 163
 According to Greco's theory, Contorno originally told the government that the Bagheria meeting occurred at the latest in February 1980 and, according to Greco, the government, in making its opening statement and its alibi demand, relied upon this representation. When the government learned of evidence showing that Greco most likely was in the United States in February 1980, it changed its position, and stated in its November 19, 1985 statement to Greco that the meeting may have occurred in February or March 1980. Then, according to Greco, Contorno, to conform to the government's new position, falsely testified that he believed the meeting occurred in "February, March" 1980.
 
 
 164
 Greco sought to have the alibi demand admitted to prove that Contorno had fabricated his testimony. To prove that such a fabrication occurred, Greco would have had to establish that, before testifying, Contorno actually believed, or at least told the government, that the meeting occurred at the latest in February 1980. However, the admission of the alibi demand would not have established what Contorno believed or what he told the government. The alibi demand would only have shown that the government originally believed that the meeting occurred sometime before February 14. So long as the government based its original position on something other than a representation by Contorno, the alibi demand could not establish what Contorno originally believed or told the government. Here, Stewart told the court that the government based its original position regarding the date of the Bagheria meeting on the timing of Castronovo's departure from Sicily and the meeting in Palermo. Since the district judge believed that the government did not base its original position on a representation by Contorno, he acted reasonably in excluding the alibi demand; the admission of the alibi demand would not have established that Contorno's testimony differed from what he actually believed or told the government.
 
 
 165
 The district court also acted reasonably in refusing to allow Greco to call the Department of Justice attorney, Stewart, as a witness. Stewart told the court that Contorno had made no statements to the government which differed from his testimony. We see little reason to believe that by examining Stewart, Greco would have been able to establish that Contorno had fabricated his testimony.
 
 
 166
 Finally, we reject as frivolous Greco's argument that the district court, by allowing Greco to argue in summation that Contorno had testified falsely, recognized that argument "as being legitimate," and therefore was obligated to admit the evidence Greco offered in support of his claim. A district court does not endorse an argument merely by allowing it to be made. The district judge had no obligation to admit the evidence Greco offered, so long as he had a valid reason to exclude it. As already discussed, such a valid reason existed--namely, that the evidence would not have tended to establish that Contorno's testimony was fabricated. In sum, we conclude that the district court did not commit reversible error in excluding the alibi demand from evidence or in refusing to allow Greco to call the government attorney as a witness.
 
 VII. Restitution Order
 
 167
 As part of their sentences, the district court ordered several of the appellants to pay restitution "to a fund which shall be utilized for the medical treatment, rehabilitation and restitution of persons injured by addiction to narcotics in the 1980s." In imposing the restitution order, Judge Leval asserted that he was acting pursuant to 18 U.S.C. Sec. 3579(b)(2) (1982) (enacted as part of the Victim and Witness Protection Act of 1982) (redesignated Sec. 3663, effective November 1, 1987).[2] Those appellants sentenced to pay restitution now challenge the restitution order, claiming it was improper. We agree and we vacate the relevant portions of the judgments of sentence.
 
 
 168
 We begin our analysis by noting that, in reviewing restitution orders, we apply an abuse of discretion standard. See United States v. Atkinson, 788 F.2d 900, 902 (2d Cir.1986); United States v. Richard, 738 F.2d 1120, 1122 (10th Cir.1984). We also note, however, that a federal court has no inherent power to order a defendant to pay restitution, United States v. Elkin, 731 F.2d 1005, 1010 (2d Cir.), cert. denied, 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984); further, a "court's otherwise broad discretion to determine the punishment to be imposed on a defendant is circumscribed by the sentencing limitations established by statute." Id. at 1010.
 
 
 169
 Before the enactment of the Victim and Witness Protection Act, district courts were authorized to order restitution payments pursuant to 18 U.S.C. Sec. 3651 (1982) (repealed, effective November 1, 1987). Under Sec. 3651, a district court was authorized to require a defendant, as a condition of the defendant's probation, "to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had." Interpreting Sec. 3651 in Fiore v. United States, 696 F.2d 205, 209 (2d Cir.1982), this court wrote that a "defendant may not be required to pay reparations to persons not aggrieved by his crimes, or simply to the community at large." A restitution order like the one under consideration here would provide reparations to the addict community at large and clearly would have been impermissible under Sec. 3651. Using the defendants' money, the subject fund would be used to provide care to individuals who could not be shown to have been injured by these defendants. It cannot be gainsaid that it would have been contrary to Congress' intent in enacting Sec. 3651 to compel one group of suppliers to pay to ameliorate the deleterious effects of drug usage attributable to drugs supplied by others.
 
 
 170
 While 18 U.S.C. Sec. 3579 (now Sec. 3663), like Sec. 3651 before it, contains no explicit prohibition against a restitution order which requires payment on behalf of individuals whose injuries have no connection to the activities of the defendants, the legislative history and the language of Sec. 3579 clearly indicate to us that such orders have not been authorized by Congress. In enacting Sec. 3579, Congress intended to allow a district court to order a criminal defendant to make whole those who had been victimized by that defendant. See S.Rep. No. 532, 97th Cong., 2d Sess. 30, reprinted in 1982 U.S.Code Cong. & Admin.News 2515, 2536 ("The premise of [Sec. 3579] is that the court in devising just sanctions for adjudicated offenders, should insure that the wrongdoer make [good], to the degree possible, the harm he has caused his victim." (emphasis added)). The legislative history contains no hint that Sec. 3579 was meant to authorize restitution orders which would compel defendants to make whole the victims of crimes committed by others. Moreover, the language of Sec. 3579(b)(2) shows that Congress did not contemplate broad restitution orders such as the one at issue here. The language of this provision sets forth in detail those costs incurred by a victim which may be used to calculate the amount of restitution. By taking pains to spell out which of the victim's costs could be used to calculate the amount of restitution, the Congress in drafting Sec. 3579(b)(2) clearly evinced no intent to authorize the district court to compel a defendant to pay for other losses suffered by the defendant's victim, and, a fortiori, for losses suffered by individuals with whom the defendant had no provable connection.
 
 
 171
 Title 18 U.S.C. Sec. 3580(a) (redesignated Sec. 3664, effective November 1, 1987) lends further support to our determination that the district court abused its discretion in imposing the restitution order. Section 3580(a) (now Sec. 3664) requires that "[t]he court, in determining whether to order restitution under section 3579 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense." (emphasis added). The district court need not make factual findings on the record regarding the amount of the victim's damages, United States v. Golomb, 811 F.2d 787, 791 (2d Cir.1987), but, under the statute, it must at least consider the amount of loss sustained by individual victims. Here, the district court could not have been expected to identify any individual victims who suffered a loss as a result of the offenses committed by these appellants. Therefore, the district court could not have considered the amount of loss any such victims may have suffered. That the district court obviously could not comply with Sec. 3580(a) in this regard reinforces our conclusion that the subject restitution order was not authorized by law.
 
 
 172
 In arguing that the restitution order was proper, the government relies on United States v. Danilow Pastry Co., 563 F.Supp. 1159 (S.D.N.Y.1983). In Danilow, the district court held that it was proper under Sec. 3651 to order six bakeries which had pleaded nolo contendere to charges of price-fixing to donate fresh baked goods to certain charitable organizations. We withhold judgment as to whether Danilow was properly decided. Even assuming for purposes of this appeal that it was properly decided, Danilow, by its own terms, involved an order clearly distinguishable from the one in this case. The court in Danilow made clear that its holding only applied to "non-monetary, community service," id. at 1171, and stated that in cases involving "a monetary payment," "the defendant may not be required to pay reparations to persons not aggrieved by his crimes," id. at 1170 (quoting Fiore, 696 F.2d at 209).
 
 
 173
 The government's reliance on United States v. Ruffen, 780 F.2d 1493 (9th Cir.), cert. denied, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986), is also misplaced. In Ruffen, the Ninth Circuit affirmed a district court order, issued pursuant to Sec. 3579, which required a defendant to pay restitution to a county social services agency after he pled guilty to conspiring to steal and convert to his own use federal funds which were presumably earmarked for the agency's use. Id. at 1494. While the court noted that the defendant had defrauded taxpayers, it identified the county as the "victim" for purposes of Sec. 3579. Id. at 1496. In Ruffen, therefore, the court identified a victim which had suffered a loss as a consequence of the crime of the defendant. Here, the court identified no individual victims who suffered injury attributable to the appellants' crimes.
 
 
 174
 While the effect of our reversal of the district court's restitution order will deprive unidentified drug users of a modicum of care which they might otherwise receive, Congress has enacted no law authorizing such an order and we are obliged to act within the constraints of the applicable statute, see Elkin, 731 F.2d at 1010. Therefore, we vacate the relevant portions of the judgments of sentence pertaining to restitution.VIII. Mazzurco's Post-Arrest Statement
 
 
 175
 On April 9, 1984, FBI agents arrested Mazzurco and informed him of his constitutional rights. At the time of his arrest, Mazzurco told the agents that he knew defendant Pietro Alfano and that the previous year he and Alfano had thought about buying a pizzeria together. During his direct examination at trial, Mazzurco testified that he had engaged in the business of importing precious stones into the United States. On cross-examination, the prosecutor asked Mazzurco whether at the time of his arrest he told the FBI agents that he was "dealing precious stones with Mr. Alfano?" The district court overruled the objection which followed this question. Mazzurco replied to the question: "No, I did not."
 
 
 176
 On appeal, Mazzurco argues that the district court violated his due process rights by allowing the prosecutor's question, and that the court's ruling constitutes reversible error. The government argues that the question was proper since Mazzurco, after receiving Miranda warnings, elected to speak about his relationship with Alfano. We agree with Mazzurco that the district court erred by allowing the question. However, we conclude that the error was harmless.
 
 
 177
 In Doyle v. Ohio, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), the Supreme Court held that a defendant suffers a deprivation of due process when the prosecution uses his post-arrest, post-Miranda warnings silence to impeach an explanation he subsequently offered at trial. In Anderson v. Charles, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980), the Court held that "Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements." Here, the government cites Anderson in support of its argument that the question asked on cross-examination was proper.
 
 
 178
 It is evident to us that Anderson does not apply here since Mazzurco's statement to the FBI agents and his testimony during direct examination were not inconsistent. It is logically consistent that Mazzurco could have known Alfano and considered buying a pizzeria with him and, concurrently, could have been in the business of importing precious stones.
 
 
 179
 By making a post-arrest statement about Alfano, Mazzurco did not open the door to any and all questions about Alfano the government might have cared to ask him during cross-examination. Indeed, for purposes of analysis under Doyle, even if a defendant has made statements to the police after receiving Miranda warnings, he is deemed to have maintained his silence, unless the post-arrest statements are inconsistent with the defendant's testimony at trial. See Anderson, 447 U.S. at 407 n. 2, 100 S.Ct. at 2182 n. 2 (in Doyle, defendant deemed to have remained silent for due process purposes despite his having made statements to arresting officer, since his statements did not contradict later testimony); Phelps v. Duckworth, 772 F.2d 1410, 1412 (7th Cir.) (en banc) (for Doyle purposes, defendant deemed not to have remained silent after arrest since "[b]efore trial ... he denied he had been sexually involved with Mrs. Clem, whereas at the trial he told a completely different story that he ... had sexual intercourse with her"), cert. denied, 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985). Here, since Mazzurco's post-arrest statement was not inconsistent with his trial testimony, we conclude that for Doyle purposes he remained silent. Therefore, we conclude that, under Doyle, the district court violated Mazzurco's due process rights by allowing the prosecutor's inquiry.
 
 
 180
 Although we find the district court erred, we also conclude that the error was harmless. An error of constitutional dimension may be held to have been harmless if the government can show " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). Appraisal of an error's impact depends on the nature of the violation in the context of a given factual setting. Hawkins v. LeFevre, 758 F.2d 866, 878 (2d Cir.1985).
 
 
 181
 In Hawkins, this court held that the Doyle-type violation which occurred in that case was of a "grievous nature." Id. at 879. In Hawkins, the trial judge, rather than the prosecutor, made the inquiry which violated the defendant's rights. Id. at 875. Moreover, the inquiry concerned the defendant's silence not only at the time of his arrest, but also after his arrest, in the district attorney's office and in the grand jury room. Id. at 876. Finally, the trial judge made repeated references to the defendant's having maintained his silence. Id. at 869-70. Here, by contrast, the prosecutor, not the judge, asked the offending question; the question concerned only Mazzurco's silence immediately after his arrest, and not later; and, finally, Mazzurco does not contend on appeal that the prosecutor, after asking the improper question, thereafter sought to make a point of Mazzurco's silence. These distinctions between Hawkins and the instant case lead us to conclude that the violation of Mazzurco's due process rights was not of a "grievous nature."
 
 
 182
 Furthermore, in Hawkins, the evidence against the defendant was tenuous. Id. at 878. Here, by contrast, the evidence supporting a finding that Mazzurco was guilty was strong.
 
 
 183
 To demonstrate the weight of the evidence against Mazzurco, which we only partially describe here, we briefly recount an incident in which Mazzurco was involved and then list the fruits of the FBI's search of Mazzurco's home, car, and garage. Evidence was presented to show that on July 25, 1983, a federal agent telephoned defendant Benito Zito and expressed interest in buying some heroin. Following the agent's call, Mazzurco engaged in coded conversations with defendant Giuseppe Ganci and then, on July 31, delivered a blue box to Ganci's home. On August 1, Zito told the agent that his associates had heroin available and, two days later, Zito delivered to the agent a blue box which contained heroin. Inside the box, on tissue paper, was Mazzurco's palmprint.
 
 
 184
 When an FBI agent searched Mazzurco's garage on April 9, 1984, he seized a wooden box which, according to the evidence, contained traces of heroin. (See infra Point XV.) The search of Mazzurco's house, car and garage also revealed a scale which contained traces of heroin and cocaine, a money-counting machine, a loaded semi-automatic handgun, ammunition, approximately $46,000 in cash, and a notebook containing records, which, according to the testimony of the agent who found the notebook, appeared to relate to criminal transactions.
 
 
 185
 We conclude that, based on the nature of the violation and the trial record as a whole, the error in allowing the prosecutor's question was harmless. "[T]he properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [error] so insignificant by comparison, that it is clear beyond a reasonable doubt that [the error] was harmless error." Parker v. Randolph, 442 U.S. 62, 70-71, 99 S.Ct. 2132, 2138, 60 L.Ed.2d 713 (1979) (plurality) (footnote omitted).
 
 IX. Devardo's Plea Agreement
 
 186
 On July 21, 1986, Devardo pled guilty to two counts of firearms violations in a superseding information. As part of the plea agreement Devardo reached with the government, the government promised that it would "make no recommendation as to sentence with regard to counts on this information." Nowhere in the agreement did the government state that it reserved the right to comment upon the nature of Devardo's crimes. However, the government did "reserve all rights to respond to any arguments that the defendant makes to the court prior to or at sentencing." Prior to his sentencing on July 23, 1987, Devardo presented material to the district judge in support of a lenient sentence. Judge Leval then sentenced Devardo to four years in prison on each count, to be served concurrently.
 
 
 187
 Prior to Devardo's presenting his material to the district court, the government, on May 27, 1987, filed a sentencing memorandum with the court. The memorandum recounted the government's case against the defendants and then discussed in detail the allegations and evidence presented against each of the eighteen defendants the jury had found guilty. In the final section of the memorandum, the government wrote that the defendants should be divided into two groups, a group of higher level criminals, who performed supervisory functions in the conspiracy, and a group of lower level criminals, who took orders. It placed Devardo in the second group. The government then wrote "we respectfully submit that the culpability of the defendants standing before the Court should be regarded in the primary and secondary groupings set forth." The government also wrote that "no defendant should receive an artificial benefit because of the fortuity of the charges against others. Such blind 'ranking' fails to account for the unparalleled degree of criminal activity of these defendants, who are fortunate that they do not all face more potential incarceration."
 
 
 188
 On appeal, Devardo contends that the government, by submitting the sentencing memorandum, violated that part of his plea agreement in which the government promised not to make any recommendation as to his sentence. He argues that he should be resentenced before another judge. We conclude that the government breached the plea agreement, but we deny Devardo's request for resentencing.
 
 
 189
 To determine whether a plea agreement has been breached, we must determine what the parties to the plea agreement reasonably understood to be the terms of the agreement. United States v. Carbone, 739 F.2d 45, 46 (2d Cir.1984); Paradiso v. United States, 689 F.2d 28, 31 (2d Cir.1982), cert. denied, 459 U.S. 1116, 103 S.Ct. 752, 74 L.Ed.2d 970 (1983). In United States v. Corsentino, 685 F.2d 48, 49 (2d Cir.1982), as this court noted, the government entered a plea agreement with the defendant, promising that it would "take no position at sentence." During the course of a colloquy with the defendant prior to acceptance of the plea agreement, the district judge expressly noted that the government had retained the right to submit "a brief setting forth its view of the facts." Id. Prior to sentencing, the government submitted to the district court a sentencing memorandum detailing Corsentino's crimes and their significance. In the court's opinion, Judge Newman wrote that a "plausible interpretation" of the government's promise in the plea agreement was that "the Government would make no comment to the sentencing judge, either orally at sentencing or in writing prior to sentencing, that bears in any way upon the type or severity of the sentence to be imposed." Id. at 51. However, we concluded that in light of the reference the district judge made to the defendant about the prospect of the government submitting a sentencing memorandum, the defendant must be deemed to have reasonably understood that the government's promise to "take no position" did not preclude the filing of such a document. Id.
 
 
 190
 In United States v. Diamond, 706 F.2d 105 (2d Cir.1983), we made clear that our position in Corsentino was that "if the Government wishes to refrain only from recommending a specific sentence, the prosecutor should make that limited commitment clear and retain the right 'to present facts and arguments bearing upon sentencing,' ... or use other words to that effect." Id. at 106 (emphasis added).
 
 
 191
 Here, the government did not reserve its right to comment upon the nature of Devardo's crimes. If it had wished to reserve such a right, "it should have stated so explicitly." Carbone, 739 F.2d at 47. Since we are unaware of any evidence in the record which demonstrates that Devardo reasonably understood that the government might comment upon the nature of his crimes in a sentencing memorandum, we conclude that the government's submission of these comments breached the plea agreement. Cf. United States v. Weinberg, 852 F.2d 681, 687-88 (2d Cir.1988) (government's pre-sentencing submissions to district court which commented on seriousness of defendant's crimes did not breach promise to "make no specific recommendation with respect to sentencing," when government reserved the right to detail to the court "the nature and extent of [the defendant's] criminal activities").
 
 
 192
 Although we conclude that the government breached the plea agreement, "[a] breach ... does not automatically require resentencing." United States v. Brody, 808 F.2d 944, 948 (2d Cir.1986). "The nature of the remedy varies with the nature of the broken promise and the facts of each particular case." Id. Here, the government did reserve the right to respond to any arguments Devardo might make at sentencing, and we are satisfied that the brief statements the government made about Devardo in its sentencing memorandum could properly have been presented to the district court as rebuttal to Devardo's arguments. Since the government's statements regarding Devardo were brief, and since they could properly have been presented to the court after Devardo presented his material, we fail to perceive "any possible prejudicial effect caused by the prosecutor's breach." Id. Therefore, we deny Devardo's request for resentencing.
 
 X. Alleged Prosecutorial Misconduct
 
 193
 Casamento claims that his conviction should be vacated and the indictment dismissed. He presents two arguments to support this claim. First, he argues that the government, during the grand jury proceeding, made only a summary presentation of the evidence it had against Casamento, deliberately presented misleading evidence and deliberately withheld exculpatory evidence. Second, he argues that the government, in a pre-trial memorandum to the district court, deliberately misrepresented the evidence it would present at trial in order to induce the court to deny Casamento's motion for severance. Having considered these arguments, we conclude that Casamento's arguments lack merit.
 
 A. Grand Jury Proceeding
 
 194
 In arguing that the government acted improperly during the grand jury proceeding, Casamento contends: that the government, choosing not to rely on the witnesses and surveillance photographs it presented against him at trial, made only a summary presentation to the grand jury of the evidence it had against him; that the government deliberately attempted to convey the false impression to the grand jury that he was involved in a delivery of narcotics sales proceeds which occurred on November 18, 1980, by referring to a delicatessen near the place where the delivery allegedly occurred as the "Casamento Deli"; and that the government acted improperly by failing to present as a witness one Calogero Petralia, who had previously told the government that a meeting which he and Casamento attended--and which the government believed concerned narcotics--did not in fact concern narcotics.
 
 
 195
 Before addressing Casamento's allegations, we note generally that the dismissal of an indictment following a conviction is an "extraordinary" remedy. United States v. Thibadeau, 671 F.2d 75, 77 (2d Cir.1982). As for Casamento's first allegation--that the government merely summarized the evidence against him for the grand jury--we conclude that even if this allegation is true, the indictment need not be dismissed. An indictment, if valid on its face, may not be challenged on the ground that it is based on inadequate evidence. United States v. Contreras, 776 F.2d 51, 54 (2d Cir.1985) (citing Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408-09, 100 L.Ed. 397 (1956)).
 
 
 196
 In considering Casamento's allegation regarding the November 18, 1980 delivery, we note that to warrant dismissal of an indictment after a conviction, "the prosecutor's conduct [must] amount[ ] to a knowing or reckless misleading of the grand jury as to an essential fact." United States v. Bari, 750 F.2d 1169, 1176 (2d Cir.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). By referring to the delicatessen as the "Casamento Deli," the government did not knowingly or recklessly mislead the grand jury. The delicatessen, owned by Casamento's brother Francesco, was named "Casamento Brothers Salumeria." Therefore, it was not inappropriate for the government to refer to the delicatessen as the "Casamento Deli." The government never contended that appellant Filippo Casamento owned the delicatessen. While the government, to avoid any confusion, probably should have made clear to the grand jury that Filippo Casamento did not own the delicatessen, we do not believe that its failure to do so amounted to prosecutorial misconduct, warranting the "extraordinary" remedy of dismissing the indictment.
 
 
 197
 In considering Casamento's allegation regarding Petralia's exculpatory statement, we note that a prosecutor ordinarily need not submit to the grand jury evidence which may negate a defendant's guilt. See United States v. Ciambrone, 601 F.2d 616, 622-23 (2d Cir.1979). The prosecutor should present exculpatory evidence where such evidence is "substantial" and "where it might reasonably be expected to lead the jury not to indict." Id. at 623. Here, the government did not act improperly in failing to call Petralia as a witness before the grand jury. Petralia, having attended the meeting, would presumably have had a strong self-interest in testifying that the meeting did not concern illegal activities. In light of this likely self-interest, we do not believe the prosecutor reasonably could have expected that such testimony by Petralia would "lead the jury not to indict." Thus, the government had no obligation to present Petralia as a witness. In sum, we find no reason to dismiss the indictment based on the government's conduct during the grand jury proceeding.
 
 B. Pre-Trial Memorandum
 
 198
 On June 26, 1985, the government submitted to the district court a memorandum, the purpose of which was in part to oppose Casamento's motion for severance. Casamento argues that his conviction should be vacated and the indictment dismissed because, he alleges, the government made deliberate misrepresentations regarding the evidence it would offer against him during trial.
 
 
 199
 Casamento's argument fails. While it appears that at trial the government may not have adduced evidence to support each of the statements it discussed in the memorandum, we do not believe that such a failure, without more, constitutes prosecutorial misconduct. See Frazier v. Cupp, 394 U.S. 731, 736, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969) ("Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance."); see also United States v. Garza, 664 F.2d 135, 142 (7th Cir.1981) (defendant has burden of establishing prosecutorial bad faith), cert. denied, 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982); United States v. Turkette, 656 F.2d 5, 8-9 (1st Cir.1981) (same); United States v. Biaggi, 672 F.Supp. 112, 119 n. 14 (S.D.N.Y.1987) (same). Having examined the record, we see no indication that the government's statements were deliberate misrepresentations.
 
 
 200
 Moreover, a dismissal of an indictment based on a prosecutor's conduct or misconduct is warranted only where a substantial right of the defendant has been jeopardized. United States v. Wilson, 715 F.2d 1164, 1169 (7th Cir.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983); see also United States v. Martinez-Nava, 838 F.2d 411, 416 (10th Cir.1988) (prosecutorial misconduct may be harmless); United States v. Hernandez, 779 F.2d 456, 458 (8th Cir.1985) (prosecutorial conduct only grounds for reversal when it prejudicially affects defendant's substantial rights so as to deprive defendant of a fair trial). Here, Casamento asserts that the purpose of the alleged prosecutorial misconduct was to deny him a separate trial. We have already concluded, based on the record evidence, that Casamento was not improperly denied a separate trial (see supra Point I), and, in addition, we find no prosecutorial misconduct aimed at denying him a separate trial. We therefore reject Casamento's arguments as unpersuasive.
 
 XI. Badalamenti's Contempt Conviction
 
 201
 On April 21, 1987, Badalamenti conditionally pled guilty to a one-count indictment which charged him with criminal contempt under 18 U.S.C. Sec. 401. The indictment charged Badalamenti with refusing to answer many of the prosecution's questions during cross-examination at his trial. On appeal, Badalamenti argues that his contempt conviction was erroneous.
 
 
 202
 First, Badalamenti argues that his refusal to answer many of the prosecutor's questions was proper since he had invoked his fifth amendment privilege against self-incrimination. Even assuming arguendo that Badalamenti did properly assert his fifth amendment privilege as to certain questions, other questions he simply refused to answer without giving any reason whatsoever for his refusal. For example, asked during cross-examination about the specific location of a cattle ranch he claimed he owned, Badalamenti stated, "I refuse to answer this question." Asked to give examples of the colors of precious stones he claimed to have had in his possession, Badalamenti gave one example and then said "[t]hat's enough." As Judge Leval noted, Badalamenti decided "to testify to the extent that it would help him and to refuse to testify to the extent that it wouldn't help him." Having refused to answer questions on cross-examination without giving a reason for his refusal, Badalamenti may not now claim that his contempt conviction was improper on the ground that he invoked the fifth amendment as to some of the questions.
 
 
 203
 Badalamenti also contends that his contempt conviction was erroneous since, he claims, certain of the questions he was asked on cross-examination were irrelevant to the charges against him. This argument is frivolous. Even assuming arguendo that certain of the questions addressed to him were irrelevant to the charges against him, many of the questions he refused to answer were directly relevant. For example, the question discussed above regarding the color of precious stones was relevant to the credibility of Badalamenti's defense, asserted in the principal prosecution, that he had been a dealer not of narcotics but of precious stones. The question regarding the cattle ranch similarly was relevant to the credibility of Badalamenti's defense that he was a legitimate businessman.
 
 
 204
 Next, Badalamenti argues that his contempt conviction was erroneous because the government either (1) could have had his direct testimony stricken and thereby could have avoided having to cross-examine him, or (2) could have induced him to testify fully on cross-examination by bestowing upon him a testimonial immunity that, according to Badalamenti, would have prevented the use of his statements against him by prosecutors in Italy. This argument is also frivolous. We know of no authority which supports the argument that the government had a duty to take either of the two courses Badalamenti suggests, nor that Badalamenti should benefit from the government's failure to take either one.
 
 
 205
 Finally, Badalamenti argues that the contempt conviction violated the terms of the treaty under which he was extradited from Spain. He claims that the conviction was improper since the offense for which he was convicted, namely, criminal contempt, was not an offense for which he was extradited. This argument has no merit. As Badalamenti himself notes, the treaty contains an exception for "offenses committed after the extradition" to its general rule that the person extradited can only be convicted of offenses for which he was extradited. Treaty on Extradition, May 29, 1970, United States-Spain, art. XIII, 22 U.S.T. 738, 744, T.I.A.S. No. 7136. Since Badalamenti's contempt conviction related to acts committed after his extradition, his conviction was not improper.
 
 XII. Badalamenti's Extradition
 
 206
 Badalamenti presents three claims on appeal which relate to his extradition from Spain. First, he argues that his conviction on counts one and two of Indictment SS 84 Cr. 236 were obtained in violation of his rights under the due process clause of the fifth amendment. In essence, he argues that the government used deception to obtain custody of him from the Spanish authorities who held him. The government, Badalamenti alleges, falsely told Spanish authorities that he was to be tried for heroin dealing when, Badalamenti asserts, the evidence at trial showed, at most, that he had participated in a conspiracy to import only cocaine.
 
 
 207
 The factual premise of Badalamenti's argument is incorrect. The government sought Badalamenti's extradition from Spain on the basis of an indictment which charged Badalamenti with participating in a conspiracy to import narcotics into the United States. At trial, the government presented evidence that Badalamenti indeed had participated in such a conspiracy. Since the government represented to Spanish authorities that Badalamenti was involved in a narcotics trafficking conspiracy, and then presented evidence at trial to support this charge, his claim of deception fails. His first argument, therefore, is without merit.
 
 
 208
 Next, Badalamenti argues that his conviction on count two, for engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848, violated the terms of the treaty under which he was extradited. He argues that, since under the treaty a person can only be extradited for crimes punishable in both Spain and the United States, Treaty on Extradition, May 29, 1970, United States-Spain, art. II, 22 U.S.T. 738, 738, T.I.A.S. No. 7136, and since Spain has no crime equivalent to the one delineated at 21 U.S.C. Sec. 848, his conviction for that crime was improper. This argument also lacks merit. In Messina v. United States, 728 F.2d 77, 79 (2d Cir.1984), we made it clear that an extradition treaty's requirement that extraditable crimes be punishable in both nations "is met if the particular acts charged are criminal in both jurisdictions, regardless of whether the crimes bear the same names." See also Collins v. Loisel, 259 U.S. 309, 311, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922). Here, count two of the indictment charged Badalamenti with having committed a series of narcotics-related violations. In essence, count two charged Badalamenti with having participated in narcotics trafficking. As Badalamenti concedes, trafficking in narcotics is punishable as a crime in Spain, thus, we conclude, his conviction on count two did not violate the extradition treaty. The fact that Spain may have no narcotics law bearing the characterization "continuing criminal enterprise" or containing the identical elements as Sec. 848 is of no consequence here.
 
 
 209
 Finally, Badalamenti argues that his forty-five year prison sentence violates the terms of his extradition order from Spain. Badalamenti argues that in the extradition order, Spain prohibited the court from sentencing him to more than thirty years in prison. However, the extradition order requires only that "the maximum period of imprisonment may not in any event exceed 30 years." Instead of selecting a thirty-year sentence, which might have resulted in mandatory release after good time credits in twenty to twenty-three years, the district judge sentenced Badalamenti to prison for forty-five years but ordered that he be released after thirty years. Therefore, the sentence does not violate the extradition order.
 
 XIII. Cross-Examination of Badalamenti
 
 210
 In its case-in-chief, the government presented evidence of taped telephone conversations in which Badalamenti spoke in what appeared to be code with several of his co-defendants about what appeared to be business transactions. In his defense case, Badalamenti took the stand and testified that these telephone conversations had nothing to do with drug trafficking. On cross-examination, the prosecutor questioned Badalamenti at length about the subject matter of these conversations. Badalamenti refused to answer many, but not all, of the prosecutor's questions. After the completion of the prosecutor's cross-examination, the other defendants and the government stipulated that if questioned by the other defendants, Badalamenti would refuse to answer the same questions he refused to answer during cross-examination by the government.
 
 
 211
 On appeal, Catalano, Mazzurco, and Giuseppe and Salvatore Lamberti argue that their rights under the due process clause of the fifth amendment and under the confrontation clause of the sixth amendment were violated because the prosecutor on cross-examination was allowed to ask Badalamenti numerous questions about the telephone conversations. We find no merit to this argument.
 
 
 212
 The due process rights of a defendant may be violated both (1) when the prosecution commits misconduct by " 'mak[ing] a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege' " and (2) when, " 'in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case.' " Rado v. Connecticut, 607 F.2d 572, 581 (2d Cir.1979) (quoting Namet v. United States, 373 U.S. 179, 186-87, 83 S.Ct. 1151, 1154, 10 L.Ed.2d 278 (1963)), cert. denied, 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980); see United States v. Maloney, 262 F.2d 535, 537-38 (2d Cir.1959). Here, the record does not support any inference of prosecutorial misconduct. In light of the apparently random pattern in which Badalamenti answered or refused to answer questions, we do not see how the government could have known in advance which questions would trigger the invocation of the fifth amendment privilege. Therefore, Badalementi may not rely upon his fifth amendment argument as a basis for claiming the government was prohibited from posing its questions to him; we conclude that the prosecutor was guilty of no misconduct.
 
 
 213
 Moreover, Badalamenti's refusal to answer many of the prosecution's questions did not add critical weight to the case against the other defendants. The evidence of the pertinent telephone conversations themselves, consisting of what seemed to be talk in code about business deals, provided substantial support to the government's case against the defendants. The inferences the jury may have drawn from Badalamenti's refusals to answer the prosecution's questions about these conversations, by comparison, added little to the government's case against these defendants. Since this is not a case in which the "witness' refusal to testify is the only source, or even the chief source, of the inference that the witness engaged in criminal activity with the defendant[s]," Namet, 373 U.S. at 189, 83 S.Ct. at 1156, no due process violation occurred.
 
 
 214
 For the same reason, we conclude that the district court did not violate appellants' rights under the confrontation clause. The appellants correctly argue that, in certain circumstances, a defendant may suffer a deprivation of his rights under the confrontation clause when a witness' refusal to answer questions creates inferences unfavorable to the defendant and crucial to the government's case, and also prevents the defendant from cross-examining the witness. See Douglas v. Alabama, 380 U.S. 415, 419-20, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965). Here, Badalamenti's co-defendants had no opportunity to cross-examine him since, as they and the government stipulated, he would have refused to answer the same questions he refused to answer during his cross-examination by the government. However, as has already been noted, any inferences created by Badalamenti's refusal to answer questions about the telephone conversations helped the government's case only slightly compared to the support provided to the government's case by the telephone conversations themselves. Since the inferences from Badalamenti's denials did not "form[ ] a crucial link," Douglas, 380 U.S. at 419, 85 S.Ct. at 1077, in the government's case, no confrontation clause violation occurred. See also Namet, 373 U.S. at 189, 83 S.Ct. at 1156; Rado, 607 F.2d at 579.
 
 XIV. Excusal of Juror No. 313
 
 215
 On the second day of jury deliberations, the district judge was informed that the daughter of Juror No. 313 had received a threatening telephone call at her place of work the previous day. United States v. Badalamenti, 663 F.Supp. 1539, 1540 (S.D.N.Y.1987). The caller had told the daughter, in effect, that "he was going to get her." Id. at 1540. There was no evidence linking the call to any of the defendants.
 
 
 216
 Upon learning of the call, Judge Leval interviewed Juror No. 313. In response to his asking whether the call had "affected you as a juror, if at all?," Juror No. 313 responded:
 
 
 217
 As to my ability to perform as a juror, it hasn't affected me. It's just, you know, my children are my life. You know, I'm more concerned about her than anything else, her being okay. Other than that, it hasn't affected my ability to think or to judge in any way.
 
 
 218
 Id.
 
 
 219
 Following the interview, Judge Leval decided to excuse the juror. In his memorandum and order dated June 26, 1987, he explained that he excused the juror because he believed that (1) she might tell the other jurors about the incident, causing them to panic about the safety of their own families and thus causing a mistrial; (2) she was obviously worried, troubled and upset; and (3) her statement that the incident would not affect her ability to serve as a juror could not be entirely trusted, since the fears about the threat to her child would continue to prey upon her. Id. at 1541.
 
 
 220
 Defendants requested that after the excusal of Juror No. 313 an alternate juror be substituted in her place. Despite this request, the district judge ordered deliberations to continue with eleven jurors.
 
 
 221
 On appeal, Catalano, Mazzurco, and Giuseppe and Salvatore Lamberti contend that the judge violated Fed.R.Crim.P. 23(b) by excusing Juror No. 313, and that he committed reversible error by refusing to substitute an alternate juror in her place.
 
 
 222
 Under Fed.R.Crim.P. 23(b), "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors." Whether in the circumstances "just cause" exists to excuse a juror is a matter within the discretion of the district court. See United States v. Stratton, 779 F.2d 820, 832 (2d Cir.1985), cert. denied, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986). Here, the district judge clearly did not abuse his discretion in deciding to dismiss Juror No. 313. In our view, the reasons he expressed in his memorandum and order for excusing the juror were entirely sound.
 
 
 223
 Appellants argue that Juror No. 313's representation that the incident had not affected her ability to perform as a juror should have been sufficient to assure the judge that she could perform competently, and that therefore the judge acted improperly in excusing her. Whether or not the judge properly could have kept this juror on the jury based on her representation is not the issue here. Even if he could have done so, it does not follow that he was obligated to do so. As already discussed, the district judge acted within his discretion in excusing the juror under the circumstances.
 
 
 224
 Next, appellants contend that the district court committed reversible error by allowing deliberations to proceed with eleven jurors, instead of adding an alternate in the place of Juror No. 313. Appellants do not argue that the applicable rule does not permit deliberations to proceed with eleven jurors. Indeed, they acknowledge that allowing deliberations to continue with eleven jurors may be preferable to adding an alternate. See Fed.R.Crim.P. 23(b) advisory committee's note to the 1983 amendment. Rather, appellants argue that the judge committed reversible error because he did not realize that adding an alternate juror would have also been a permissible option. Whether or not the district judge believed he was prohibited from adding an alternate juror, and whether, if he had such a belief, that belief was correct, are not questions that need concern us here. Whatever the belief that led to the district judge's ruling, under the caselaw of this circuit, that ruling was not only permissible, but was preferable to adding an alternate. See United States v. Scopo, 861 F.2d 339, 350 (2d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1750, 104 L.Ed.2d 186 (1989); Stratton, 779 F.2d at 831.
 
 XV. Authentication of Plastic Bag
 
 225
 Mazzurco argues that the government failed to authenticate a plastic bag containing traces of heroin which the government alleged was seized from Mazzurco's garage, and hence, that the district court erred by admitting evidence of the bag. We agree that the admission of the bag was error, but we find that the error was harmless.
 
 
 226
 During the trial, FBI agent William Lynch testified that on April 9, 1984, pursuant to a search warrant, he searched the premises of Mazzurco's residence in Baldwin, New York. On the premises, Lynch discovered, inter alia, a money-counting machine, a semi-automatic handgun, and hollow-point bullets. Lynch testified that, in Mazzurco's garage, he seized two wooden boxes. At trial, these boxes were designated as government exhibits 5033-2-A and 5033-2-B ("box A" and "box B"). Upon opening the boxes, Lynch discovered that they contained traces of white powder. Lynch testified that he then gave the two boxes to another agent for transmittal to a DEA laboratory for testing. A DEA chemist who examined the boxes testified that he found a plastic bag in box A, and that this plastic bag contained heroin. The chemist also testified that he found stains on the top of box B and that these stains also contained traces of heroin.
 
 
 227
 During cross-examination, Lynch stated that he did not recall whether or not when he seized the boxes in Mazzurco's garage one of the boxes contained a plastic bag. When the defense counsel showed Lynch the bag which the chemist found in box A, Lynch testified that he did not recall ever having seen it before. An inventory list of items seized from Mazzurco's house and garage did not mention the plastic bag, although it did mention the boxes.
 
 
 228
 Generally, before an item may be admitted into evidence, the proponent of the item must provide evidence sufficient to support a finding that the item is what the proponent claims. Fed.R.Evid. 901(a). To satisfy the authentication requirement, the proponent "need only prove a rational basis from which to conclude that the exhibit did, in fact, belong to the appellants." United States v. Mendel, 746 F.2d 155, 167 (2d Cir.1984), cert. denied, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985). Evidence establishing a chain of custody may constitute sufficient proof. Id. at 166. In reviewing a district court's determination that an item of evidence has been authenticated, we apply an abuse of discretion standard. See id. at 167.
 
 
 229
 We conclude that the government failed to provide sufficient evidence to support a finding that the plastic bag the chemist found in box A came from Mazzurco's garage. In light of Lynch's testimony that he could not recall whether or not one of the boxes contained a bag; his testimony that he could not recall ever having seen the bag the chemist found in box A; and the absence of any mention of the bag on the inventory list, we conclude that no chain of custody was established for the plastic bag. Because we conclude that the record fails to provide a sufficient basis from which one could rationally conclude that the bag came from Mazzurco's garage, it is evident that the admission of evidence concerning the bag was an abuse of discretion.
 
 
 230
 The district court's error, however, was harmless. In light of Lynch's testimony identifying box B as an item he seized at the same time that he seized box A; the testimony that at that time he saw traces of white powder in box B as well as in box A; sufficient evidence of a chain of custody relating to box B; and, finally, the chemist's testimony that box B contained traces of heroin, we conclude that the admission of box B into evidence was proper and that the improper admission of the bag allegedly found in box A, under these circumstances, cannot be said to have caused significant prejudice.
 
 XVI. Government's Summation
 
 231
 Polizzi claims that several remarks in the government's summation caused him to suffer a deprivation of his due process rights. First, Polizzi argues that the government had no basis other than speculation for the following statements made during summation: (a) that certain telephone calls defendant Giuseppe Ganci received in 1983 concerned the importation of narcotics; (b) that Polizzi's role in the conspiracy was that of an investor; and (c) that Polizzi's purpose in standing next to Ganci on April 28, 1983 when Ganci received a call on a public telephone was to "vouch" for Ganci. Second, Polizzi argues that the government, in an effort to bolster its argument that Polizzi was an investor in the narcotics enterprise, deliberately misquoted a telephone conversation between Ganci and Mazzurco which occurred on April 30, 1983.
 
 
 232
 We are not persuaded by Polizzi's arguments. The government has broad latitude in the inferences it may reasonably suggest to the jury during summation. United States v. Nersesian, 824 F.2d 1294, 1327 (2d Cir.), cert. denied, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); United States v. Suarez, 588 F.2d 352, 354 (2d Cir.1978). However, a prosecutor's statements during summation, if improper, will result in a denial of the defendant's due process rights if the statements cause substantial prejudice to the defendant. Nersesian, 824 F.2d at 1327; see also United States v. Wilkinson, 754 F.2d 1427, 1435 (2d Cir.) (improprieties in prosecutor's summation warrant new trial when they deprive defendant of fair trial), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). In determining whether the defendant suffered substantial prejudice, we will view the allegedly improper statements in the context of the prosecutor's entire argument to the jury. See Wilkinson, 754 F.2d at 1435.
 
 
 233
 Here, the government's summation, for the most part, was entirely proper. Moreover, to the extent the government's statements bordered on or crossed beyond the bounds of propriety, they did not substantially prejudice Polizzi. Therefore, we conclude that Polizzi suffered no deprivation of his due process rights.
 
 
 234
 The record demonstrates that, within a two-month period in early 1983, Ganci, who lived in Queens, New York, on at least three occasions drove to certain public telephones located in New Jersey, near a motor lodge owned by Polizzi. On two occasions during this period, government agents saw Ganci receive a call on a public telephone in this area, each time on a different telephone. Also, on April 28, 1983, Polizzi stood by Ganci as Ganci spoke on yet a third public telephone. Intercepted telephone conversations between Ganci and Polizzi make it clear that Polizzi helped Ganci arrange the calls he received on the public telephones. Moreover, the evidence suggests that during the period in which Ganci received these calls, Ganci met with Polizzi frequently. A remark Ganci made in an intercepted telephone call--in which he complained to Polizzi that he did not "pass by" because he "couldn't get rid of that guy"--suggests that Ganci, during this period, was aware that he was under government surveillance. Polizzi does not dispute that the calls Ganci received came from Sicily.
 
 
 235
 We believe that it was entirely reasonable for the government to argue to the jury, and to suggest as an inference that could be drawn from the evidence, that the telephone calls Ganci received concerned the importation of narcotics. Support for this inference lies in the clear evidence that Ganci in 1983 was involved in narcotics trafficking (see, e.g., supra Points II(D), VIII), and that, as Polizzi concedes on appeal, "[p]roofs do connect Ganci with narcotics connections in Sicily." Further support lies in the suspicious manner in which Ganci received these calls and Ganci's driving far from his home to receive a call on a public telephone, especially when he appears to have known he was under government surveillance--each strongly suggests consciousness of guilt. Cf. United States v. Young, 745 F.2d 733, 753 (2d Cir.1984) (reasonable for jury to infer from surreptitious nature of transaction that it involved narcotics), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); United States v. Fiotto, 454 F.2d 252, 254 (2d Cir.) (clandestine character of actions was among facts from which jury could infer that appellants had heroin in their possession), cert. denied, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972). In light of all of this evidence, we conclude that the government acted properly when it stated in summation that the jury could infer that Ganci's calls concerned narcotics.
 
 
 236
 Although less obvious support exists for the government's statement that Polizzi was an investor in the narcotics trafficking enterprise, we nevertheless believe that the government acted reasonably in arguing to the jury that this was Polizzi's role. Polizzi's efforts in helping Ganci receive the overseas telephone calls and what appear to have been his frequent meetings with Ganci during the period in which the calls were made, in the total context of this case, reasonably allowed a jury finding that Polizzi was involved in the narcotics conspiracy. The record shows, inter alia, and Polizzi does not dispute, that he was wealthy. Ganci's leaving his home to travel to locations near Polizzi's business and his meetings with Polizzi suggest that Polizzi had a significant role in Ganci's narcotics operations. Further, a telephone conversation between Ganci and Mazzurco made on April 30, 1983, discussed below, plausibly suggests that Polizzi was the person Ganci looked to for funds he needed for the narcotics operation. In light of Polizzi's wealth, his inferable central role in the conspiracy, and the April 30, 1983 telephone conversation, we believe that it was not improper for the government to argue that the jury could conclude that Polizzi's role in the conspiracy was that of an investor.
 
 
 237
 We agree with Polizzi that the government had no way of knowing precisely why, on April 28, 1983, Polizzi stood by Ganci when Ganci received a telephone call. Although it was permissible for the government to suggest that Polizzi was an investor in the enterprise, the government's argument that on that particular day Polizzi stood by Ganci to "vouch" for him appears to have been based on little more than speculation. However, while the government's statement may have been improper, we do not believe it caused Polizzi to suffer a deprivation of his due process rights. The record contains sufficient evidence to support a conclusion that Polizzi was a conspirator, and to support a reasonable inference that his role in the conspiracy was that of an investor. In light of this evidence, although we believe the government should not have made the statement regarding vouching, we believe that this statement did not substantially prejudice Polizzi. See United States v. Modica, 663 F.2d 1173, 1181 (2d Cir.1981) ("if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial"), cert. denied, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).
 
 
 238
 Finally, we conclude that the government's statements regarding the April 30, 1983 telephone conversation between Mazzurco and Ganci did not substantially prejudice Polizzi. Speaking in code, Mazzurco told Ganci that Mazzurco was supposed to bring $95,000 to Badalamenti's representative. (See supra Point II(B).) In response, Ganci said: "I've got about 40, let's say they are here. That guy is not here."[3] Mazzurco then asked, "And what are we going to do?" Ganci responded: "What do I know? If tomorrow morning I might see this guy. But I don't believe so. Because he went, if I knew this before, I would have called him and that guy would have come down." In its discussion of this conversation during its summation, the government told the jury:
 
 
 239
 So you see the financial problem that Ganci has at this precise point in time. What does Ganci do? He says "Gee, if I knew that you needed this money I would talk to that guy, but the guy is not here because he went to Florida." Who is the guy that went to Florida that day? Polizzi.
 
 
 240
 (Emphasis added.) The records show that Polizzi was in Florida for four days preceding May 3, 1983.
 
 
 241
 Pointing to the government's use of the words "because he went to Florida," which Ganci did not use in the telephone conversation, Polizzi argues that the government deliberately misquoted the conversation, in order to bolster its argument that he was an investor in the narcotics enterprise. We do not believe that the government was purporting to quote the conversation, but only to paraphrase it.[4] That the government was presenting a condensed, stylized version of the conversation is obvious. Nevertheless, in our view, the government, in adding the phrase "because he went to Florida," clearly went beyond the license allowed for paraphrasing. However, although this statement was improper, we do not believe that it substantially prejudiced Polizzi. Even if the government had not stated that Ganci said "because he went to Florida," the jury nonetheless could have reasonably inferred from Polizzi's wealth, his central role in Ganci's operations, and his having been away on a trip to Florida at the time of the conversation, that the "guy" Ganci was referring to as a potential source of funding was Polizzi. Thus, the only harm the government's improper statement caused was to make an inference, which could have been reasonably drawn in any case, appear more obvious than it actually was. In light of the abundant evidence supporting Polizzi's conviction, we cannot conclude that this harm amounted to substantial prejudice. See Modica, 663 F.2d at 1181. In sum, we conclude that none of the statements in the government's summation deprived Polizzi of his due process rights.
 
 CONCLUSION
 
 242
 We have considered appellants' other arguments and find them to be without merit.
 
 
 243
 We affirm the judgments of conviction and sentence of all the appellants, except that we reverse Castronovo's conviction on count ten, Trupiano's convictions on counts one and sixteen, and we vacate the restitution penalty imposed as part of eight of the appellants' sentences.
 
 
 244
 APPENDIX
Appellant Count Charged Found Sentence
 Guilty?
Gaetano Narcotics Yes 15 years* (concurrent with sentence
 Badalamenti Conspiracy on count 2); $25,000 fine **
 (1)
 Continuing Yes 45 years (concurrent with sentence on
 Criminal count 1) (with mandatory release
 Enterprise upon completion of 30 years);
 (2) $100,000 fine
 Criminal Yes 1 1/2 years (concurrent with sentence
 Contempt on Indictment SS 84 Cr. 236)
 (one count
 in
 Indictment
 86 Cr. 1128)
Giovanni Narcotics Yes 12 years (concurrent with sentence on
 Cangialosi Conspiracy count 16); $25,000 fine
 (1)
 Racketeering Yes 12 years (concurrent with sentence on
 (16) count 1); $25,000 fine
Filippo Narcotics Yes 30 years (concurrent with sentence on
 Casamento Conspiracy count 16); $50,000 fine
 (1)
 Racketeering Yes 20 years (concurrent with sentence on
 (16) count 1); $25,000 fine; $200,000
 restitution
Frank Narcotics Yes 15 years (consecutive with sentences
 Castronovo Conspiracy on counts 14 and 15, concurrent
 (1) with sentences on counts 10, 12 and
 16); $25,000 fine
 Continuing Yes 25 years (concurrent with sentences
 Criminal on counts 1, 12, 14, 15 and 16);
 Enterprise $100,000 fine
 (10)
 Currency Yes 5 years (concurrent with sentences on
 Reporting counts 1, 10, 14, 15 and 16);
 Violation $10,000 fine (concurrent with other
 (12) fines)
 Currency Yes 5 years (consecutive with sentences
 Reporting on counts 1 and 15, concurrent with
 Violation sentences on counts 10, 12 and 16);
 (14) $200,000 fine (concurrent with
 other fines)
 Currency Yes 5 years (consecutive with sentences
 Reporting on counts 1 and 14, concurrent with
 Violation sentences on counts 10, 12 and 16);
 (15) $200,000 fine
 Racketeering Yes 20 years (concurrent with sentences
 (16) on counts 1, 10, 12, 14 and 15);
 $25,000 fine; $200,000 restitution
Salvatore Narcotics Yes 15 years (consecutive with sentences
 Catalano Conspiracy on counts 14, 15 and 16, concurrent
 (1) with sentences on counts 3 and 12);
 $25,000 fine
 Continuing Yes 45 years (concurrent with sentences
 Criminal on counts 1, 12, 14, 15 and 16);
 Enterprise $100,000 fine
 (3)
 Currency Yes 5 years (concurrent with sentences on
 Reporting counts 1, 3, 14, 15 and 16);
 Violation $10,000 fine (concurrent with other
 (12) fines)
 Currency Yes 5 years (consecutive with sentences
 Reporting on counts 1, 15 and 16, concurrent
 Violation with sentences on counts 3 and 12);
 (14) $500,000 fine (concurrent with
 other fines)
 Currency Yes 5 years (consecutive with sentences
 Reporting on counts 1, 14 and 16, concurrent
 Violation with sentences on counts 3 and 12);
 (15) $500,000 fine
 Racketeering Yes 20 years (consecutive with sentences
 (16) on counts 1, 14 and 15, concurrent
 with sentences on counts 3 and 12);
 $25,000 fine; $1,000,000
 restitution
Lorenzo Firearms Pled 4 years on each count, to be served
 Devardo *** Violations guilty concurrently
 (two counts
 in
 Information
 SSSSS 84 Cr.
 236)
Salvatore Narcotics Yes 15 years (consecutive with sentences
 Greco Conspiracy on count 14, concurrent with
 (1) sentences on counts 12 and 16);
 $25,000 fine
 Currency Yes 5 years (concurrent with sentences on
 Reporting counts 1, 14 and 16); $10,000 fine
 Violation (concurrent with other fines)
 (12)
 Currency Yes 5 years (consecutive with sentence on
 Reporting count 1, concurrent with sentences
 Violation on counts 12 and 16); $150,000 fine
 (14)
 Racketeering Yes 20 years (concurrent with sentences
 (16) on counts 1, 12 and 14); $25,000
 fine
Giuseppe Narcotics Yes 15 years (consecutive with sentence
 Lamberti Conspiracy on count 16, concurrent with
 (1) sentence on count 5); $25,000 fine
 Continuing Yes 30 years (concurrent with sentences
 Criminal on counts 1 and 16); $100,000 fine
 Enterprise
 (5)
 Racketeering Yes 20 years (consecutive with sentence
 (16) on count 1, concurrent with
 sentence on count 5); $25,000 fine;
 $500,000 restitution
Salvatore Narcotics Yes 15 years (concurrent with sentence on
 Lamberti Conspiracy count 16); $25,000 fine
 (1)
 Continuing No
 Criminal
 Enterprise
 (7)
 Racketeering Yes 20 years (concurrent with sentence on
 (16) count 1); $25,000 fine; $500,000
 restitution
Giovanni Narcotics Yes 15 years (concurrent with sentence on
 Ligammari Conspiracy count 16); $25,000 fine
 (1)
 Racketeering Yes 15 years (concurrent with sentence on
 (16) count 1); $25,000 fine; $200,000
 restitution
Salvatore Narcotics Yes 15 years (consecutive with sentence
 Mazzurco Conspiracy on count 16); $25,000 fine
 (1)
 Continuing No
 Criminal
 Enterprise
 (6)
 Continuing No B3
 Criminal
 Enterprise
 (6)
 Racketeering Yes 20 years (consecutive with sentence
 (16) on count 1); $25,000 fine; $500,000
 restitution
Emanuele Narcotics Yes 12 years (concurrent with sentence on
 Palazzolo Conspiracy count 16); $25,000 fine
 (1)
 Racketeering Yes 12 years (concurrent with sentence on
 (16) count 1); $25,000 fine
Francesco Narcotics Yes 15 years (concurrent with sentence on
 Polizzi Conspiracy count 16); $25,000 fine
 (1)
 Racketeering Yes 20 years (concurrent with sentence on
 (16) count 1); $25,000 fine; $200,000
 restitution
Salvatore Narcotics No
 Salamone Conspiracy
 (1)
 Currency Yes 5 years (concurrent with sentences on
 Reporting counts 13 and 14)
 Violation
 (12)
 False Yes 5 years (concurrent with sentences on
 Statements counts 12 and 14)
 to the
 I.R.S. (13)
 Currency Yes 5 years (concurrent with sentences on
 Reporting counts 12 and 13)
 Violation
 (14)
 Racketeering No
 (16)
Giuseppe Narcotics Yes 1 year
 Trupiano Conspiracy
 (1)
 Racketeering Yes Suspended sentence; 5 years'
 (16) probation
Giuseppe Narcotics Yes 5 years
 Vitale Conspiracy
 (1)
 Racketeering Yes Suspended sentence; 5 years'
 (16) probation
 
 
 245
 * Unless otherwise noted, years means years of imprisonment.
 
 
 246
 ** Unless otherwise noted, all fines are cumulative.
 
 
 247
 *** Devardo was charged in counts 1 and 16 in Indictment SS 84 Cr. 236, but
 
 
 248
 pled guilty to lesser charges in Information SSSSS 84 Cr. 236.
 
 
 249
 Judgments of conviction and sentence reversed herein.
 
 
 250
 Restitution penalties vacated herein.
 
 
 
 [1]
 The quotations from intercepted telephone calls are translations from Sicilian. Those words in these quotations which were originally spoken in English are italicized
 
 
 [2]
 Section 3579(b)(2) states that a restitution order may require that a defendant:
 in the case of an offense resulting in bodily injury to a victim--
 (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
 (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and
 (C) reimburse the victim for income lost by such victim as a result of such offense.
 
 
 [3]
 At trial, Mazzurco conceded that "40" meant $40,000
 
 
 [4]
 We attach no significance to the fact that in the trial transcript the government's statement concerning Ganci's remarks appears between quotation marks. These quotation marks were probably added by the court reporter, who, seeing the words "He says," decided the language which followed should be set off as a quotation